Argued and submitted January 31, conviction for unlawful possession of firearms reversed and remanded; otherwise affirmed September 5, petition for review denied December 26, 2007 (343 Or 691)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

MARLECE JOAN WEAVER,
aka Marlece Joan Rigby,
*Defendant-Appellant.*

Jackson County Circuit Court
024097MI; A126383

168 P3d 273

Susan F. Drake, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter A. Ozanne, Executive Director, Office of Public Defense Services.

Susan G. Howe, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Haselton, Presiding Judge, and Brewer, Chief Judge, and Armstrong, Judge.

BREWER, C. J.

**BREWER, C. J.**

Defendant appeals her convictions for interfering with a peace officer, ORS 162.247, and unlawful possession of a firearm, ORS 166.250. She assigns error to the trial court's denial of her motion for a judgment of acquittal on the first charge and, with respect to the second charge, to the court's denial of her motion to suppress evidence that police officers found inside her residence during a warrantless search. We affirm defendant's conviction for interfering with a peace officer and reverse and remand her conviction for unlawful possession of a firearm.

The pertinent facts are essentially undisputed. In August 2002, defendant had three minor children living in her residence. On August 22, defendant's 16-year-old daughter called the Oregon Department of Human Services (DHS), Child Welfare Program, to express concern about her own welfare and the welfare of her brother and sister. The daughter reported that defendant was using alcohol daily, thought people who were on the radio were talking directly to her, rarely spoke to her children, and would cry and dissociate herself from reality. The daughter reported that the house was littered with dog and rodent excrement and that defendant would cough to the point of passing out but refused to get medical treatment.

The daughter was concerned for the safety of any DHS workers who might come to the house because defendant had firearms. She also was concerned for her and her siblings' well-being, should defendant discover that DHS was investigating her. The daughter therefore told DHS that, instead of DHS workers coming to her home, she and her siblings would come to the DHS offices.

On the day that the children were expected at the DHS offices, they did not arrive. A DHS worker called the children and learned that defendant had hit one of the children. Five days after the daughter's initial phone call to DHS, DHS workers decided that they could not wait any longer for the children to come to the offices. They contacted the police

in order to have officers accompany them to defendant's residence, and two DHS workers and two Jackson County Sheriff deputies went to the residence.

Before knocking on the door, the DHS workers briefed the officers on the information that they had received from defendant's daughter, including that defendant had access to firearms. One of the officers had run a criminal history check on defendant before coming to the residence and had learned that, pursuant to a previous mental commitment order, defendant was prohibited from possessing firearms. One of the DHS workers then knocked on defendant's door. One of the children answered the door and, at the officers' request, the child asked defendant to come to the door. When defendant came to the door, the DHS workers identified themselves and the deputies and explained to defendant that they were there to investigate allegations of child abuse and needed to enter the residence. Defendant refused them entrance, stating that they could not enter without a search warrant. When the officers persisted, defendant "[became] irate and started yelling" and things started to "tense up." At that point, because of a growing safety concern and, in anticipation that defendant might slam the door, one of the officers "nudged" his foot inside the door. Defendant then slammed the door on the officer's foot. At that point, one of the officers entered into the front of the residence and grabbed defendant's arm; she resisted, and the officers took her into custody. Once defendant was in the officers' car, one of defendant's daughters allowed the DHS workers and the officers into the home, and the children showed the officers and workers where defendant's firearms were located. Thereafter, defendant was charged with one count of interfering with a peace officer and one count of unlawful possession of firearms.

Defendant moved to suppress any evidence obtained from the search, arguing that the entry and subsequent search violated Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution. The trial court denied the motion, concluding that "the deputy's actions in preventing [d]efendant from closing the door and the subsequent tour of the premises by [invitation of] the children [were] reasonable." Defendant waived

her right to a jury trial, and the case was tried to the court. Defendant moved for a judgment of acquittal on the interfering with a peace officer charge on the ground that she was entitled to resist the officers' entry into her residence because it was unlawful. The trial court denied the motion, and it convicted defendant on both counts.

■      On appeal, defendant challenges both convictions. We first address her challenge to the conviction for interfering with a peace officer. ORS 162.247 provides, in part:

"(1)   A person commits the crime of interfering with a peace officer * * * if the person, knowing that another person is a peace officer * * *

"(a)   Intentionally acts in a manner that prevents, or attempts to prevent, a peace officer or parole and probation officer from performing the lawful duties of the officer with regards to another person[.]"

The trial court concluded that defendant committed the charged offense when she tried to stop the deputy from entering her home. Defendant argues that the court erred in denying her motion for judgment of acquittal, because the deputy made a warrantless entry into her home, his action therefore was illegal and, for that reason, she was not attempting to prevent him from performing a lawful duty. The state argues that the deputy's entry was lawful; he was accompanying DHS workers as they investigated defendant's daughter's report of child abuse and, in light of the specific concerns for the children's and DHS workers' safety, the deputy's entry was lawful either under his community caretaking functions, ORS 133.033, or the emergency aid doctrine. As framed by the parties' arguments, then, defendant's conviction rests on the lawfulness of the deputy's warrantless entry.

■      A police officer generally must have a warrant to enter or search a person's premises. *State v. Bridewell*, 306 Or 231, 235, 759 P2d 1054 (1988). Warrantless entries are unreasonable under both Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution, unless they fall within "one of the few specifically established and carefully delineated exceptions to the warrant requirement." *Id.* Because we conclude that the challenged entry was lawful under the emergency aid

doctrine, we need not address whether the entry also was lawful under the community caretaking statute.[1]

The emergency aid doctrine is a well-recognized exception to the warrant requirement. *State v. Christenson*, 181 Or App 345, 352, 45 P3d 511 (2002). In *State v. Bentz*, 211 Or App 129, 135, 158 P3d 1081 (2007), we explained:

> "Under the emergency aid doctrine, a warrantless entry into a residence is lawful if (1) the police have reasonable grounds to believe that there is an immediate need for their assistance for the protection of life; (2) there is a 'true emergency'—that is, the circumstances giving rise to the police's belief that action is necessary actually exist; (3) the search is not primarily motivated by an intent to arrest a person or seize evidence; and (4) the police reasonably believe that, by making the warrantless entry, they will discover something that will alleviate the emergency. *State v. Follett*, 115 Or App 672, 680, 840 P2d 1298 (1992), *rev den*, 317 Or 163 (1993). For a true emergency to exist, there must be an identifiable potential victim of a life-threatening incident, an identifiable potential perpetrator of a dangerous act, or both. *State v. Burdick*, 209 Or App 575, 581, 149 P3d 190 (2006)."

The state argues that, when the deputy prevented defendant from closing the door and entered the residence, all four prongs of the emergency aid doctrine were satisfied. Based on the trial court's findings of fact, by which we are bound because there is evidence in the record to support them, *State v. Bost*, 317 Or 538, 541, 857 P2d 132 (1993), we conclude that the state is correct.

The trial court found that the following facts existed and that the deputy knew of those facts at the time that he prevented defendant from closing the door: The children had contacted DHS to report their mother's neglect and their

---

[1] ORS 133.033 provides, in part:

"(1) * * * [A]ny peace officer of this state * * * is authorized to perform community caretaking functions.

"(2) * * *

"(a) The right to enter or remain upon the premises of another if it reasonably appears to be necessary to:

"(A) Prevent serious harm to any person or property."

need for help; defendant had been the subject of a previous mental health commitment order; her reported current behavior indicated that she was not mentally stable; despite a court order prohibiting defendant from possessing firearms, defendant had firearms in her home; defendant recently had struck one of the children; and the children were fearful for the safety of DHS workers because of the firearms, as well as fearful for themselves, should defendant find out that they had contacted DHS. In addition, the officers knew that at least one of the children was present in the house. When defendant became irate and started yelling at the officers, those facts gave the deputy reasonable grounds to believe that the children, and possibly the DHS workers and officers, were in immediate danger should the door close and the deputies lose contact with defendant and the children. Thus, the first prong of the test was satisfied.

■ With respect to the second prong, that is, whether a "true emergency" existed, defendant argues that any emergency had dissipated during the five-day interval that elapsed between the daughter's call to DHS and the workers' and officers' arrival at defendant's house. Defendant also asserts that, in any event, the officers created any emergency by attempting to enter the residence, and the state should not be allowed to rely on an emergency that it created. Whether a true emergency exists depends on the facts present at the time that the officer made the warrantless entry. *State v. Russell,* 118 Or App 652, 655, 848 P2d 657, *rev den,* 317 Or 272 (1993).

Although the need for immediate action may have dissipated to some extent over the five-day period between August 22 and August 27, things changed on the latter day. First, before they came to the house, the officers had run a criminal history check on defendant and had learned that, as a consequence of a mental commitment order, she was prohibited from possessing firearms. That knowledge, coupled with the previously obtained information that defendant possessed firearms, created a heightened safety concern. The deputy testified that he had been in similar circumstances where a door was closed and locked, the officers could not get into the house, "and there's a safety concern there." Second, the officers knew that at least one child was present inside

the residence, creating a risk that defendant would take action against that child for reporting her to DHS. Third, defendant actually became irate and started yelling when the officers persisted in seeking access to the residence. That conduct, coupled with the other information that the officers had, constituted a true emergency. Although the officers' concern for the children's safety was based, in part, on their and the DHS workers' presence at defendant's door, neither DHS nor the officers engineered the emergency. The officers responded because the children had called DHS for help, and there was a reasonable concern for the immediate safety of the children and the DHS workers who were trying to help them. In short, the circumstances giving rise to the officers' belief that action was necessary actually existed.

We also conclude that the third and fourth prongs of the emergency aid doctrine were met. The trial court found, and there is evidence to support that finding, that the only purpose of the visit was to investigate child abuse and neglect, not criminal conduct. The deputy entered the home to prevent defendant from locking the door and harming either the children or the DHS workers and the officers. We therefore conclude that the deputy's entry was lawful and that defendant's conviction for interfering with a peace officer must be affirmed.[2]

■     We turn to defendant's conviction for unlawful possession of firearms. The evidence of that crime was based on the search made pursuant to the second entry into defendant's home, after she had been handcuffed, arrested, and taken to the officers' car. At the hearing on defendant's motion to suppress, the state argued that the second warrantless entry was lawful either because the children consented to the search or because ORS 419B.020 authorized the DHS workers to enter defendant's premises without a warrant. The trial court concluded that the entry was lawful because the children consented to the search.

---

[2] Defendant also argues that her conviction should be overturned because ORS 162.247 is facially overbroad. The Oregon Supreme Court recently declared in *State v. Illig-Renn*, 341 Or 228, 236-37, 142 P3d 62 (2006), that ORS 162.247 is not "susceptible to a facial overbreadth challenge."

After the trial court's ruling, the United States Supreme Court decided *Georgia v. Randolph*, 547 US 103, 126 S Ct 1515, 164 L Ed 2d 208 (2006), in which the Court held that a co-occupant of a home did not have authority to allow officers to enter a residence where the defendant had refused to allow them entry. *Id.* at 122-23. The state concedes that, based on that decision, the second entry into defendant's residence was unlawful if it was solely based on the children's consent.

Alternatively, however, the state asserts that ORS 419B.020[3] authorized DHS or the officers to enter defendant's home without her consent and that the second warrantless entry therefore did not violate Article I, section 9, or the Fourth Amendment.[4] ORS 419B.020 (2005) provided, in part:

"(1)   Upon receipt of an oral report of child abuse, the Department of Human Services or the law enforcement agency shall immediately:

"(a)   Cause an investigation to be made to determine the nature and cause of the abuse of the child[.]"

According to the state, the legislature's mandate that DHS "shall * * * [c]ause an investigation to be made to determine the nature and cause of [child abuse]," implicitly requires or authorizes DHS, in certain types of child abuse claims, to enter a person's residence without a warrant. The state acknowledges that nothing in the statute expressly gives DHS or law enforcement officers such authority. Nevertheless, the state argues that, because child abuse claims involving failure to provide adequate food, clothing, or shelter[5] relate to conditions within a residence, the investigation of such claims necessarily encompasses intrusions into residences. The state reasons that, by requiring investigations to

---

[3] The legislature amended ORS 419B.020 in 2007. Or Laws 2007, ch 781, § 1; Or Laws 2007, ch 59, §§ 4, 5. All subsequent references to the statute refer to the 2005 version.

[4] The state does not rely on the emergency aid doctrine to justify the second warrantless entry.

[5] Under ORS 419B.005(1)(a)(F), child abuse includes "the failure to provide adequate food, clothing, shelter or medical care that is likely to endanger the health or welfare of the child."

be made in such circumstances, the legislature implicitly authorized warrantless entries to effectuate them.[6]

■ Our task in determining the legislature's intent in enacting a particular statute is first to examine the text and context of the statute. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-11, 859 P2d 1143 (1993). In so doing, we look at related statutes, as well as consider statutory and some common-law rules of construction. *Id.* We conclude, based on the text and context of the statute and the text of similarly worded statutes, that the legislature did not intend to authorize DHS to make warrantless entries into a residence in order to investigate claims of child abuse.

The state's argument hinges on the scope of the meaning of the word "investigate." The term is not defined by statute. However, its ordinary meaning is to "EXAMINE, SCRUTINIZE * * * to make a systematic examination * * * to conduct an official inquiry." *Webster's Third New Int'l Dictionary* 1189 (unabridged ed 2002). The word itself imports no specific mandate to enter upon property. As the state points out, investigating a claim of child abuse could include examining conditions inside a residence. However, it does not follow that, merely because the legislature may have envisioned DHS workers investigating conditions within a residence, it therefore intended to authorize DHS workers to make warrantless entries into residences in the absence of the existence of a recognized exception to the warrant requirement.

The legislature has recognized the constitutional requirement for search warrants by enacting multiple provisions governing their availability and issuance. ORS 133.545, *amended by* Or Laws 2007, ch 547, § 1; ORS

---

[6] The state also argues that the second entry was effected for the purpose of conducting a permissible administrative search. *See State v. Coleman*, 196 Or App 125, 129, 100 P3d 1085 (2004), *rev den*, 338 Or 16 (2005) (holding that an administrative search is reasonable if it is conducted for a purpose other than criminal law enforcement, pursuant to a policy authorized by a politically accountable law making body, and that policy eliminates the discretion of those responsible for conducting the search). However, the state did not make or develop such an argument before the trial court, nor does the state point to a "policy," independent from its argument concerning ORS 419B.020, that justified the second warrantless entry in this case. Accordingly, we do not further consider that argument.

133.555; and ORS 133.565 specify the methods by which the state may apply for, and courts may issue, search warrants. ORS 133.310 specifies when an officer may arrest an individual without a warrant. ORS 133.693(4) places the burden of proving the validity of a warrantless search on the state. When the legislature intends to authorize a warrantless entry, it has shown that it knows how to accomplish that objective. For example, ORS 133.033 specifies the circumstances under which a police officer may enter a home for community caretaking purposes. ORS 133.575(2) requires a police officer, when executing a search warrant, to give appropriate notice to a person before entering the person's property. And, ORS 133.235(5) provides that an officer "may enter premises in which the officer has probable cause to believe the person to be arrested to be present."

The statutory provisions for fire investigations furnish a similar example in a noncriminal investigative context. ORS 476.210(1) requires a fire marshal to "investigate the cause, origin and circumstances of each fire * * * by which property has been destroyed or damaged." ORS 476.070(1) then specifically provides that the investigator may "[a]t all reasonable hours, * * * *enter upon and examine* any building or premises wherein fire has occurred." (Emphasis added.) *See State v. Felger*, 19 Or App 39, 45, 526 P2d 611 (1974) ("under the authority granted in the above statutes, it was not necessary for the fire chief to obtain either a warrant or the express permission of defendant or anyone else in order to make the required inspection"). Likewise, ORS 430.745(1) provides that DHS "shall investigate" the nature and cause of alleged abuse of an adult, while ORS 430.745(2) specifically authorizes DHS to "enter a facility and inspect and copy records of a facility or community program if necessary for the completion of its investigation." In both instances, the legislature expressly stated its intention to authorize warrantless entries for investigative purposes.

By contrast, ORS 419B.020 does not specifically authorize DHS to enter on private property to investigate a claim of child abuse. In light of the constitutional requirement for search warrants and the legislature's practice of expressly authorizing warrantless entries onto property for the purpose of conducting an investigation when that is the

legislature's intent, we conclude that ORS 419B.020 did not authorize the officers' and DHS workers' second warrantless entry into defendant's residence. *See State v. Saunders*, 103 Or App 488, 493-94, 799 P2d 159 (1990) (finding that a statute that authorized the director of the Fish and Game Commission to "enter and inspect" specified places and things necessarily authorized warrantless entries, but a statute that authorized the commission to "search and examine" areas that it believed to contain evidence of commercial fishing law violations did not authorize warrantless entries). Because the state has not established that the second entry and ensuing search in this case were authorized by an exception to the warrant requirement, the trial court erred in denying defendant's motion to suppress the evidence found as a result of the second entry.

Conviction for unlawful possession of firearms reversed and remanded; otherwise affirmed.