Argued and submitted June 25, 2007, reversed and remanded April 16, 2008

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## MICHAEL SHAWN GOODALL,
*Defendant-Appellant.*

Marion County Circuit Court
04C50659; A127943

183 P3d 199

Anne Fujita Munsey, Senior Deputy Public Defender, argued the cause for appellant. With her on the brief were Peter A. Ozanne, Executive Director, and Peter Gartlan, Chief Defender, Office of Public Defense Services, Legal Services Division.

Timothy A. Sylwester, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Edmonds, Presiding Judge, and Wollheim, Judge, and Sercombe, Judge.

WOLLHEIM, J.

**WOLLHEIM, J.**

Defendant appeals from a judgment of conviction for first-degree criminal mistreatment, ORS 163.205, and endangering the welfare of a minor, ORS 163.575. He assigns error to the trial court's order denying his motion to suppress evidence obtained as a result of the warrantless search of his home.[1] We review for errors of law, ORS 138.220, and reverse and remand.

The facts are not in dispute. In September 2004, Salem Police Department detectives Bales and Roberts went to the single-family home of defendant and codefendant Waight to investigate a complaint that drug activity might be occurring on the premises. On the front porch, the detectives saw over a dozen bags of rotting garbage with flies circling above some of the open bags. In addition, the detectives saw black mold growing across the interior of the large front window.

The detectives knocked on the front door, and Waight answered the knock. The detectives told Waight about the complaint and asked her if they could enter the home so that they could talk inside. Waight initially refused to allow the detectives to enter because her six-month-old child was sleeping, and she did not want to wake him. The detectives assured Waight that they would be quiet, and Waight consented to the detectives entering the doorway to talk. Smells of garbage, feces, and mold overwhelmed the detectives after they entered the home. The detectives observed electronic components and debris lying on the floor, dirt ground into the carpet, and general disarray.

While the detectives and Waight were talking, the child awoke and began crying. Waight left the detectives in the doorway while she retrieved her son and then held him during the ensuing discussions. The child appeared a "little dirty" but happy and in overall good health.

The detectives asked Waight for consent to look through the rest of the home. Waight refused consent, stating

---

[1] Defendant advances three assignments of error. We address only his first assignment of error because it is dispositive.

that she lacked authority to consent because the lease was in defendant's name and he was not home. The detectives told Waight that she could consent to the search of the home. Nonetheless, Waight still refused to consent. At that point, the detectives told Waight that, under "community caretaking responsibilities," they had the right to search the home without Waight's consent and that they would search her home.

During their search of the home and backyard, the detectives found similar dirty conditions, including debris and numerous soiled diapers. In addition, the detectives found three dogs in the backyard under very unkempt conditions. The detectives also noticed a "big glass bong," such as those used for smoking marijuana, on top of a cabinet. After Waight had been advised of her *Miranda* rights, she told the detectives that she and her son had come home on several occasions to find defendant and his friends smoking marijuana. The detectives placed the child into protective custody and called a protective service worker from the Department of Human Services, who came to the home and took physical custody of the child. A community service officer removed the dogs to the Humane Society.

Defendant and Waight were indicted and their cases were consolidated. Before trial, defendant moved for an order suppressing evidence discovered during the warrantless search of the home. Defendant relied on Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution.[2] In addition, defendant argued that ORS 133.033, the community caretaking statute, did not apply.

Both detectives testified at the suppression hearing that, from what they had observed on the porch and from the entryway, the detectives would have taken the child into protective custody "no matter what" was found during the search of the residence. Detective Roberts testified:

"[Prosecutor:] Okay. *All those observations made, if you had done nothing else, you had not gone into any other part of*

---

[2] On appeal, defendant does not renew his argument under the Fourth Amendment; accordingly, we do not address that issue.

*the house, had not talked to anybody at the residence about the conditions, would you have left [the child] in the house?*

"[Roberts:] *No.*

"[Prosecutor:] Why not?

"[Roberts:] Because the garbage on the porch, the black mold on the inside of the window, the smell when I stepped in, it's—it's the kind of experience being in these houses, those things are there for a reason. And they're there from poor housekeeping and unsanitary conditions that are not a safe environment for small children."

(Emphases added.)

Detective Bales's direct testimony was similar to Roberts's testimony:

"[Prosecutor:] Now, Detective Bales, *if you'd been denied any other access, [hadn't] exerted community caretaking responsibilities, and you had no choice but to either take the child and step out of the residence, or leave the residence and wait for another day, what would you have done?*

"[Bales:] The fact that we were right—right there?

"[Prosecutor:] Right.

"[Bales:] *We would have taken the child.*

"[Prosecutor:] *No matter what?*

"[Bales:] *No matter what.*"

(Emphases added.)

Detective Bales's testimony during cross-examination was consistent with his testimony on direct examination:

"[Waight's counsel:] * * * you indicated that at the time—while you were in the [entryway] you were prepared to seize the child and arrest Ms. Waight, is that—

"* * * * *

"[Bales:] Yes. Based on the garbage that I saw, the mold growing on the window, and what I could see in the living room area, I was concerned for the safety of the child—

"* * * * *

"[Bales:] —living in that environment."

During recross-examination, Detective Bales provided additional details in response to Waight's counsel's questioning:

"[Bales:] * * * *I wasn't going to leave the child in that house based on what I saw from the doorway, based on how filthy the house was, based on the condition of everything that was laying around, garbage, debris, all kinds of stuff, the mold, the garbage outside. Based on just the stuff I could see from the entryway we weren't leaving the child that—no matter (unintelligible) in the house."*

(Emphasis added.)

The trial court denied defendant's motion to suppress evidence and defendant proceeded to trial. A jury convicted defendant and Waight of first-degree criminal mistreatment and endangering the welfare of a minor.

■ Defendant's first assignment of error is that the trial court erred by denying defendant's motion to suppress the evidence discovered and seized as a result of the warrantless search of his home. We review the denial of a motion to suppress for errors of law, and we are bound by the trial court's findings of historical facts as long as there is constitutionally sufficient evidence in the record to support those findings. *State v. Ehly*, 317 Or 66, 74-75, 854 P2d 421 (1993).

■■ At the suppression hearing, the trial court made oral findings of fact:

"[T]he [detectives] had consent to step into the entryway and converse with Ms. Waight. I find further that based upon their observations of garbage and insects on the front porch garbage and a bad odor inside the house, the fact that there was a child—a young child present in the house, the fact that there was mold growing on the inside of the window, and the other conditions they described they saw as they stood in the entryway gave them the right, then, under the Community Caretaking statute, as I understand it, to conduct a search in the house, to potentially prevent serious harm to the child. * * *

"* * * * *

"* * * [O]nce that Community Caretaking statute was invoked, they had the right to search the home. * * *"

Article I, section 9, of the Oregon Constitution[3] prohibits warrantless searches, unless at least one of the exceptions to the warrant requirement is met. *State v. Stevens*, 311 Or 119, 126, 806 P2d 92 (1991). The state bears the burden of proving the existence of an exception. *Id.* Here, the state argues that the detectives' search was lawful under both ORS 133.033, the community caretaking statute, and Article I, section 9, because the search fell within the scope of the emergency aid exception. Defendant responds that, because the detectives' search of defendant's home was not reasonably necessary for any community caretaking function, their actions were not authorized by ORS 133.033 and were therefore illegal. *See State v. Bridewell*, 306 Or 231, 239, 759 P2d 1054 (1988). Additionally, defendant asserts that even if we were to conclude that the entry was authorized by ORS 133.033, the state did not prove the conditions necessary to invoke the emergency aid doctrine. As a result, defendant argues, the warrantless search was unconstitutional.

We begin with defendant's statutory argument. ORS 133.033 provides, in part:

"(1) Except as otherwise expressly prohibited by law, any peace officer of this state, as defined in ORS 133.005, is authorized to perform community caretaking functions.

"(2) As used in this section, 'community caretaking functions' means any lawful acts that are inherent in the duty of the peace officer to serve and protect the public. 'Community caretaking functions' includes, but is not limited to:

"(a) The right to enter or remain upon the premises of another if it reasonably appears to be necessary to:

"(A) Prevent serious harm to any person or property[.]

"* * * * *

"(3) Nothing contained in this section shall be construed to limit the authority of a peace officer that is inherent in the office or that is granted by any other provision of law."

---

[3] Article I, section 9, of the Oregon Constitution guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure."

The question is whether the detectives' further search of the residence was reasonably necessary to prevent serious harm to Waight's son. Defendant argues that both detectives testified that, even if they had not been able to search the house and gather further evidence, they would have immediately taken the child and removed him from the residence. Defendant concludes that, as a consequence of both detectives' testimony, "searching the residence was not reasonably necessary to prevent serious harm to [the child]. The [detectives] had all the information they needed to remove the child from the residence without a further search." The state responds that "[t]he mere fact that the [detectives], if absolutely pressed and denied any opportunity for further investigation, perhaps might have chosen to seize the infant anyway based only on their observations from the entryway does not establish that further steps under the community caretaking statute were not 'reasonably necessary.'" Instead, the state argues that ORS 133.033 authorizes searches that are reasonably necessary "to *verify* that there actually is a condition present that does present the risk of 'serious harm' to a person, in order for the [detective] to take serious step[s] to avoid that harm (*e.g.*, by seizing the endangered person)." (Emphasis in original.)[4]

The parties' contentions reduce to a question of statutory interpretation under the familiar interpretive method set out in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-11, 859 P2d 1143 (1993). Accordingly, our task is to discern the legislature's intent in enacting the statute by examining the statute's text in context and, if necessary, its legislative history and other aids to construction.

■ ORS 133.033(2)(a)(A) provides that an officer can remain on the premises when it "reasonably appears necessary" to "prevent serious harm" to any person. Because

---

[4] The state argues that the "harm" is the removal of a child from the family. However, the removal of the child is the result of the detectives' intervention. In establishing the reasonableness of the detectives' actions, the focus is on the facts present at the time that the detectives made the warrantless search, not those subsequent to their taking action or hypothetically a consequence of their intervention. *See State v. Weaver*, 214 Or App 633, 639, 168 P3d 273, *rev den*, 343 Or 691 (2007); *State v. Russell*, 118 Or App 652, 655, 848 P2d 657, *rev den*, 317 Or 272 (1993).

"reasonably" and "necessary" are not defined in the statute, we accord those terms their plain and natural meanings. *PGE*, 317 Or at 611. The dictionary defines "reasonably" as

"in a reasonable manner ‹acted quite ⇝ **2** : to a fairly sufficient extent ‹a book that is ~ good›[.]"

*Webster's Third New Int'l Dictionary* 1892 (unabridged ed 2002) (boldface in original). In turn, that definition relies on the meaning of "reasonable," which is

"**1 a :** being in agreement with right thinking or right judgment : not conflicting with reason : not absurd : not ridiculous ‹a ~ conviction› ‹a ~ theory› **b :** being or remaining within the bounds of reason : not extreme : not excessive * * * **c :** moderate * * *."

*Id.* (boldface in original). The definitions for "necessary" include,

"**b :** of, relating to, or having the character of something that is logically required or logically inevitable or that cannot be denied without involving contradiction ‹a ~ judgment› ‹a ~ relation between two things› ‹a ~ truth› ‹a ~ conclusion› - opposed to *contingent* **c :** that is inevitably fixed or determined or produced by a previous condition of things ‹a ~ result› ‹the ~ outcome of the affair› * * *."

*Id.* at 1511 (boldface and italics in original). Thus, the plain meanings of "reasonably" and "necessary" are to have some aspect of following logic or being in accordance with reason. Considered in the context of the second phrase, "prevent serious harm," the text of the statute expresses the intent that police action in remaining on the premises be one that is logically unavoidable or absolutely needed to accomplish the goal of preventing serious harm to a person or to property.

Next, we consider the phrase "prevent serious harm." "Prevent" is not defined in the statute. The dictionary definition of prevent includes "to keep from happening or existing esp. by precautionary measures : hinder the progress, appearance, or fulfillment of." *Webster's* at 1798. Thus, ORS 133.033(2)(a) authorizes those actions logically required to keep serious harm from happening.

■ However, the context of ORS 133.033(2)(a) includes the provision in ORS 133.033(1) that those actions cannot be

"expressly prohibited by law." Therefore, the constitutional prohibition on warrantless searches, subject to limited exceptions, acts as a limitation on an officer's actions under ORS 133.033. *State v. Christenson*, 181 Or App 345, 349, 45 P3d 511 (2002). As a result, when an officer's actions—logically intended to keep serious harm from happening to a person or property—include a warrantless search of a home, the search must fall within one of the constitutional exceptions to the warrant requirement.

 The emergency aid doctrine is one of the exceptions to the warrant requirement. In *State v. Follett*, 115 Or App 672, 680, 840 P2d 1298 (1992), *rev den*, 317 Or 163 (1993), this court recognized the emergency aid doctrine as an exception to the warrant requirement of Article I, section 9, only when four conditions are met: (1) the police have reasonable grounds to believe that there is an immediate need for their assistance for the protection of life; (2) there is a "true emergency," that is, the circumstances giving rise to the officer's belief that action is necessary must actually exist; (3) the search is not primarily motivated by an intent to arrest a person or seize evidence; and (4) the officer reasonably believes that, by making the warrantless entry, the officer will discover evidence that will alleviate the emergency. For a true emergency to exist, there must be an identifiable potential victim of a life-threatening incident, an identifiable potential perpetrator of a dangerous act, or both. *State v. Burdick*, 209 Or App 575, 581, 149 P3d 190 (2006).

In *Burdick*, this court analyzed the emergency aid doctrine as applied to other cases with analogous facts, including *State v. Russell*, 118 Or App 652, 848 P2d 657, *rev den*, 317 Or 272 (1993) (unresponsive mother—in plain sight—in locked home with young children). 209 Or App at 581. In *Burdick*, we stated:

> "In the cases in which we have approved the application of the emergency aid doctrine, objective indicia of a particular individual being in distress or of the presence of a potentially dangerous individual suggested that immediate action was required to protect life. Conversely, we have declined to apply the doctrine in cases in which none of the [detectives'] perceptions and no reliable witness accounts

suggested that any particular person was at risk of harming or being harmed."

*Id.*

■ Additionally, when applying the emergency aid doctrine, the court focuses on the officer's conduct at each step, *viz.*, initial entry and then subsequent entry. *See, e.g., State v. Weaver,* 214 Or App 633, 639-44, 168 P3d 273, *rev den,* 343 Or 691 (2007) (examining separately the officer's initial entry, whereby he put his foot in the door, and the subsequent entry to search after the defendant was handcuffed and in the police vehicle); *Burdick,* 209 Or App at 582-83 (the first entry caused by the officer opening a window and pulling aside curtains and the subsequent entry through the front door); *State v. Will,* 131 Or App 498, 501, 885 P2d 715 (1994) (initial entry to investigate report of domestic disturbance and subsequent entry after parties involved had left the premises). That approach requires the court to inquire about the officer's subjective belief at each step and whether that subjective belief was reasonable at that time.

■ The step-by-step approach here reveals the difficulty in justifying the search of the residence. The detectives did not need to search the residence to find the child. The child, the only individual who may have needed protection, was in Waight's arms while she was talking with the detectives in the entryway. Assuming a true emergency existed, that true emergency could have been alleviated by taking the child into protective custody, while waiting for a protective service worker from the Department of Human Services to arrive.

Again, in this case, our task is to determine whether the legislature intended the statute to authorize the search when the detectives had already decided to take the child into protective custody. At the time that the detectives had determined that the conditions justified removal, the child was in the detectives' presence and Waight was cooperating. Even when pressed, the detectives testified that the only harm they were concerned with was the child living in the home given the dirty conditions. Here, the state has not demonstrated how conducting a warrantless search of the interior of the home to verify that the same dirty conditions, viewed from the porch and entryway, existed throughout the house,

assisted in the protection of the child. The search of the premises, no matter how cursory, would do nothing to ameliorate, hinder, or stop the identified harm to the child. We conclude that the state has not proved that the requirements of ORS 133.033 were met because (1) the detectives' warrantless search of the home was not reasonably necessary to prevent serious harm to the child and (2) the conditions of the emergency aid doctrine were not satisfied. The trial court erred in denying the motion to suppress.

Reversed and remanded.