Argued and submitted April 22, Portland Community College, Portland, reversed
and remanded September 3, 2008, petition for review denied
January 29, 2009 (345 Or 690)

# STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

# LATOYA MONIQUE MARTIN,
*Defendant-Appellant.*

Multnomah County Circuit Court
050751400; A131594

193 P3d 993

Anne Fujita Munsey, Senior Deputy Public Defender, argued the cause for appellant. On the opening brief was Thomas V. Cupani. On the reply brief were Peter Gartlan, Chief Defender, Legal Services Division, and Anne Fujita Munsey, Senior Deputy Public Defender, Office of Public Defense Services.

Jamie K. Contreras, Assistant Attorney General, argued the cause for respondent. On the brief were Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Janet A. Metcalf, Assistant Attorney General.

Before Landau, Presiding Judge, and Schuman, Judge, and Ortega, Judge.

SCHUMAN, J.

## SCHUMAN, J.

Defendant appeals from a judgment of conviction for driving under the influence of intoxicants (DUII) and reckless driving. She assigns error to the trial court's denial of her motion to suppress evidence derived from a warrantless entry into her home. The trial court concluded that she consented to the entry by opening the door and running into another room; on appeal, she argues that those actions did not amount to consent. The state responds that the court correctly determined that she consented and that, in the alternative, the entry was authorized by the community caretaking statute, ORS 133.033. In a cross-assignment of error, the state contends that the entry was lawful under the "emergency aid" exception to the warrant requirement. We conclude that the entry violated Article I, section 9, of the Oregon Constitution.[1] We therefore reverse and remand.

The following facts are undisputed. Late in the evening of July 4, 2005, a witness called 9-1-1 to report that a car, later identified as belonging to defendant, had been involved in a hit-and-run accident with a parked car. The witness had followed the car to defendant's home and reported the address. Within five minutes, officers arrived at that address and found the car that the witness had identified. It was parked in the driveway, at a "skewed" angle, apparently having hit the garage door, and was somewhat damaged.

Some of the officers walked around the home knocking on windows, identifying themselves as Portland police officers, and asking the occupant to go to the front door, where another officer was knocking. The officers had two motives: to check on the welfare of the driver and to question her about her possible involvement in the hit-and-run accident. After the officers had been knocking for approximately two minutes, defendant, completely unclothed, flung open the door. Upon seeing that the person who had knocked was

---

[1] Article I, section 9, of the Oregon Constitution provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

a police officer, she turned and ran into a back bedroom. The officers briefly conferred and decided that they had only two options: to enter the home, or to leave. They decided that leaving "a naked person who's acting strangely, was just involved in a car wreck[,] * * * at midnight, [with] an open door" would be irresponsible, so they entered. They did not consider the option of obtaining a search warrant.

Inside, the officers found the bedroom into which defendant had run. The door was open, and they walked in. Defendant was lying on the bed under a blanket. One of the officers asked her if she was all right; she responded, "I'm so drunk," and then she vomited. After a female officer helped her dress, defendant was led outside, where she showed unmistakable signs of intoxication. A subsequent breath test registered a blood alcohol content of .15, nearly twice the level of presumptive legal intoxication.

Two of the officers involved in the arrest, including the one who was at the front door when defendant opened it, testified to the above facts at a pretrial hearing on defendant's motion to suppress all of the statements and other evidence obtained as a result of the warrantless entry into her home. Based on that testimony, the court concluded that, although the circumstances did not present the kind of emergency that would have justified entry under the "emergency aid" exception to the warrant requirement, the entry was nonetheless lawful because, by opening the door, defendant tacitly invited the officers to enter. The court also noted that the circumstances would justify entry under the community caretaking statute, but expressly declined to base its ruling on that conclusion. On appeal, as noted above, defendant's opening brief focuses on the court's conclusion regarding consent. The state, in response, argues that the court's consent ruling was correct and that, under the "right for the wrong reason" doctrine, *Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 659-60, 20 P3d 180 (2001), the entry was also lawful under the community caretaking statute. Further, the state cross-assigns error to the court's ruling that no true emergency existed.

We begin with the consent issue because, if we conclude that the court's ruling on that issue was correct, our

inquiry ends; valid consent would obviate the state's need to establish that an emergency existed or that the entry was authorized by ORS 133.033.[2] Our treatment is informed by two legal rules and an overarching precept. The rules are that, first, the state has the burden of establishing that defendant consented to the entry, *State v. Stevens*, 311 Or 119, 126, 806 P2d 92 (1991); and that, second, although the historical facts found by the trial court are binding if they are supported by the evidence, whether those facts amount to voluntary consent is a conclusion that we review as a matter of law, *id.* at 135; *State v. Glandon*, 166 Or App 451, 456, 998 P2d 785 (2000). The overarching precept is that

> "[t]he very purpose of [Article I, section 9, of the Oregon Constitution] was to protect a person's home from governmental intrusions. This right against intrusion should be stringently protected by the courts."

*State v. Davis*, 295 Or 227, 243, 666 P2d 802 (1983) (citation omitted).

Guided by these rules and this precept, we conclude that the state failed to prove that defendant consented to the officers' entry. It is true that voluntary consent may be manifested by conduct. *State v. Brownlie*, 149 Or App 58, 62, 941 P2d 1069 (1997). However, it is also true that neither this court nor the Supreme Court has held that a person who merely opens a door to a police officer has voluntarily consented to entry for purposes of Article I, section 9. A comparable situation occurred in only one case, *State v. Cota*, 66 Or App 650, 675 P2d 1101, *rev den*, 297 Or 124 (1984). Police had a warrant for the arrest of the defendant. When they knocked on his door, an officer showed him the warrant and informed him that he was under arrest. The defendant "did not resist by word or act and did not attempt to retreat from the doorway. [He] did not invite the officers into the house. Nor did he object to, or resist, their entry. They simply walked in without requesting his consent." *Id.* at 653. A divided court held

---

[2] As we discuss below, ORS 133.033 does not create an exception to the warrant requirement; rather, it authorizes lawful entry onto premises, that is, entry that not only falls within the ambit of ORS 133.033 but that also meets constitutional standards.

that, regardless of whether the entry was lawful, the subsequently discovered evidence had to be suppressed because the purpose of the entry—to serve the arrest warrant—had been achieved before the discovery. *Id.* at 654-55. None of the four opinions discussed the issue of consent; instead, the divisive issue was whether the arrest warrant itself provided a justification for the entry. The court again did not confront the issue of consent in *State v. Apodaca*, 85 Or App 128, 133, 735 P2d 1264 (1987); although the court held that police violated the defendant's rights under Article I, section 9, by entering an unattended but open door, the state did not argue consent and the court did not discuss it.

Nor does *State v. Voits*, 186 Or App 643, 64 P3d 1156, *rev den*, 336 Or 17 (2003), *cert den*, 541 US 908 (2004), provide significant guidance. The defendant in that case called 9-1-1 to report a "suicide" that was ultimately found to be a homicide. Although we held that an open door amounted to consent for officers to enter, we based our decision on the case's unique facts: "By calling 9-1-1, reporting a suicide, failing to restrict his request for assistance to medical personnel, admitting emergency personnel into his residence, and leaving the front door ajar, defendant manifested his consent to the police officers' initial entry into his home to investigate the death of a person." *Id.* at 648. Of somewhat more assistance is *State v. Doyle*, 186 Or App 504, 63 P3d 1253, *rev den*, 335 Or 655 (2003). In that case, we held that the defendant, the occupant of a motel room, did not tacitly consent to the officers' entry by standing silently after another occupant—one without authority to grant consent—gestured for the officers to enter: "At most, in failing to immediately object, defendant acquiesced in the officers' entry. Her silence did not establish that she had consented to that entry from the outset." *Id.* at 510-11. Thus, although the facts in *Doyle* are significantly different from those in the present case, we can nonetheless infer that mere acquiescence by silence is not consent.

In short, whether a defendant consents to police entry when she opens a door and then retreats depends on the particular facts in each case. We can imagine situations in which doing so would amount to a tacit invitation to enter. This is not one of those situations. The incident occurred at

night; there was no activity occurring in the home, and it was unlit, thereby negating the possibility that defendant meant to allow the officers in so that they could talk to somebody else. But the crucial fact is that, after opening the door, defendant—completely unclothed—ran away and retreated into her bedroom. Her haste suggests that she did not want to talk to the police, and that suggestion, in turn, suggests that her actions did not invite them in. Even if opening the door can be seen as consent, it was consent for the officers to enter the house, not consent for them to enter and then, on their own, to roam about. Walking to defendant's bedroom, in other words, exceeded the scope of any consent that merely opening the door and fleeing might have conferred. Considering all of the circumstances, and acknowledging that defendant's actions might have sent an ambiguous message, we conclude that the state did not meet its burden of proving by a preponderance of the evidence that defendant's actions amounted to anything more than passive acquiescence.

We turn therefore to the state's first alternative argument: that the entry was lawful because it was authorized by ORS 133.033, the "community caretaking" statute, which provides, in part:

"(1)  Except as otherwise expressly prohibited by law, any peace officer of this state, as defined in ORS 133.005, is authorized to perform community caretaking functions.

"(2)  As used in this section, 'community caretaking functions' means any lawful acts that are inherent in the duty of the peace officer to serve and protect the public. 'Community caretaking functions' includes, but is not limited to:

"(a)  The right to enter or remain upon the premises of another if it reasonably appears to be necessary to:

"(A)  Prevent serious harm to any person or property;

"(B)  Render aid to injured or ill persons; or

"(C)  Locate missing persons."

The state argues that this statute independently justifies the officers' action in entering defendant's home because the officers reasonably believed their entry was necessary to render aid to defendant—that, in other words, ORS 133.033 creates

an exception to the warrant requirement similar to the exceptions for emergency aid, hot pursuit, and officer safety.

We disagree. ORS 133.033 has its roots in *State v. Bridewell*, 306 Or 231, 759 P2d 1054 (1988). In that case, the court suppressed evidence that had been inadvertently discovered during a search of the defendant's property—a search motivated not by any hope or prospect of finding evidence to use in the prosecution of a crime, but by concern that the defendant was ill or wounded. The court never addressed the question whether the search survived scrutiny under Article I, section 9. Rather, it held that the law enforcement officers who conducted the search did not have statutory authority to do so:

> "In this case, the state cannot point to a statute or ordinance authorizing entries by sheriffs or their deputies in response to citizen concern about the safety and well-being of neighbors. We conclude that the deputies were without authority to enter upon defendant's premises * * *."

*Id.* at 239. The court, however, went on to make the following observation:

> "Politically accountable bodies might provide statutory or other authority for exercising the type of community caretaking function here contemplated. * * * Such authority might provide for exercising the community caretaker function in a manner that might comply with Article I, section 9."

*Id.* at 240 n 6. Evidently in response to that suggestion and to remedy the lack of a statute expressly authorizing community caretaking activities by law enforcement, the legislature enacted ORS 133.033. Exhibit I, Senate Committee on Judiciary, HB 3448, May 27, 1991 (written testimony of Polk County District Attorney Fred Avera on behalf of the Oregon District Attorneys' Association).

■ Thus, ORS 133.033 authorizes specified police entries into homes and other "premises." However, lawful governmental searches must not only be authorized, they must also avoid transgressing constitutional limitations. The two are not always coextensive. For example, the government can authorize inventory searches, but those searches

themselves must meet certain constitutionally based criteria. *State v. Atkinson*, 298 Or 1, 8-11, 688 P2d 832 (1984). In the case of community caretaking, the authority provided by ORS 133.033 is expressly limited; the statute authorizes only *"lawful* acts that are inherent in the duty of the peace officer to serve and protect the public." ORS 133.033(2) (emphasis added). As we have recently held,

> "[t]he constitutional prohibition on warrantless searches, subject to limited exceptions, acts as a limitation on an officer's actions under ORS 133.033. *State v. Christenson*, 181 Or App 345, 349, 45 P3d 511 (2002). As a result, when an officer's actions—logically intended to keep serious harm from happening to a person or property—include a warrantless search of a home, the search must fall within one of the constitutional exceptions to the warrant requirement."

*State v. Goodall*, 219 Or App 325, 334, 183 P3d 199 (2008); *see also State v. Dahl*, 323 Or 199, 205, 915 P2d 979 (1996) ("Whatever the meaning of 'lawful acts' in the context of ORS 133.033, that meaning must be consonant with the state and federal constitutions.").

Thus, ORS 133.033 does not independently establish an exception to the warrant requirement. Rather, it provides legislative authorization for (among other things) a particular class of searches, subject to many of the same constitutional constraints that operate to limit other searches, including the warrant requirement. A lawful community caretaking search, in other words, must first be within the universe of police action described in ORS 133.033, and then it must also "fall within one of the constitutional exceptions to the warrant requirement." *Goodall*, 219 Or App at 334.

Ordinarily, we would undertake the statutory analysis before considering constitutional questions under Article I, section 9. In the present case, however, judicial efficiency requires a departure from that practice. The statutory question—whether the officers' entry in this case was authorized by ORS 133.033—is a close and difficult one. The state maintains that the officers had an objectively reasonable belief that it was

> "necessary for them to enter to check on defendant and, if necessary, to render aid to her. They knew that she had

been in two automobile accidents, one when she hit a parked car and again when she hit her own garage door. They had arrived at her home within minutes of the first collision, but no lights were on in the house, and she did not respond for some time to repeated doorbell ringing, knocking, and announcing. They were concerned about her, and reasonably so. Her abrupt appearance at the door, naked, and her equally abrupt departure did nothing to alleviate their objectively reasonable concerns."

Defendant responds that the statute does not authorize police to "check on" a person; rather, the officers must reasonably believe that aid to an injured or ill person is *necessary*. According to defendant, the testimony shows only that the officers were concerned and curious, and that is not sufficient. Further, defendant argues, even if the officers did believe that the entry was necessary, that belief was not objectively reasonable, as, under *Christenson*, 181 Or App at 349, it must be.

As did the Supreme Court in another case involving the scope of ORS 133.033, we move directly to the constitutional question in order to avoid a "topic [that] would take us afield needlessly." *Dahl*, 323 Or at 205.[3] That constitutional question is whether the officers' entry falls within the "emergency aid" exception to the warrant requirement.[4] The trial court ruled that it did not and, as we explain below, we agree.

As definitively set out in *State v. Follett*, 115 Or App 672, 680, 840 P2d 1298 (1992), *rev den*, 317 Or 163 (1993), police lawfully can enter premises if four conditions are met:

---

[3] "The [statute does] not provide a comprehensive definition of what constitutes 'lawful acts.' Attempting an essay on that topic would take us afield needlessly. Whatever the meaning of 'lawful acts' in the context of ORS 133.033, that meaning must be consonant with the state and federal constitutions. Therefore, we assess the effect of [the officer's] telephoned order for defendant to 'come out of his house with his hands up' and defendant's compliance with that order within the parameters of the state and federal constitutions."

[4] None of the officers testified that, before entering, he or she had probable cause to believe that defendant had driven while under the influence of intoxicants; therefore, this case does not present an "exigent circumstances" situation based on an officer's belief that the entry was necessary because evidence of intoxication was dissipating.

"(1) The police must have reasonable grounds to believe that there is an emergency and an immediate need for their assistance for the protection of life.

"(2) The emergency must be a true emergency—the officer's good faith belief alone is insufficient.

"(3) The search must not be primarily motivated by an intent to arrest or to seize evidence.

"(4) The officer must reasonably suspect that the area or place to be searched is associated with the emergency and that, by making a warrantless entry, the officer will discover something that will alleviate the emergency."

To meet the first two conditions, the police officer must subjectively believe that his or her assistance is necessary to protect someone's life and that belief, evaluated at the time of the entry and not in light of subsequently discovered facts, must be reasonable. *State v. Martofel*, 151 Or App 249, 252, 948 P2d 1253 (1997). Put another way, the emergency aid exception justifies police action when "objective indicia of a particular individual being in distress * * * suggest[ ] that immediate action [is] required to protect life." *State v. Burdick*, 209 Or App 575, 581, 149 P3d 190 (2006). When the state relies on the exception to justify entry into a home, "the state must make a strong showing that exceptional emergency circumstances truly existed." *State v. Miller*, 300 Or 203, 229, 709 P2d 225 (1985), *cert den*, 475 US 1141 (1986).

The trial court's ruling that no true emergency existed was correct for at least two reasons. First, there is no evidence that any officer believed that entry was necessary to protect defendant's life. Only two officers testified at the hearing on defendant's motion to suppress. One described his state of mind before entering as follows:

"[I]f we were to just leave right now because we didn't feel we could go inside, now we have a naked person who's acting strangely, was just involved in a car wreck. And now at midnight, an open door and a naked person inside acting strangely, can you leave under those circumstances?"

The other officer testified that he wanted to "make sure [defendant] was OK"; that he was "worried * * * about [her] well being" and wanted to "check on [her] well being"; and

that, after seeing "that the door got opened and that some gal ran inside, and she wasn't wearing any clothes," he "was worried about her" so he "chose to go inside to check on her to make sure she was okay." While this testimony might reveal well-founded speculation that perhaps all was not well with defendant, it falls far short of revealing a belief that immediate intervention was necessary to protect her life.

Second, even if we could infer that the officers subjectively believed that defendant's life was in danger and that they had to intervene immediately to protect her, we would not conclude that such a belief was objectively reasonable. At the time of their entrance, the officers knew only that defendant might have been the driver of a car involved in one minor hit-and-run accident with a parked car, after which she drove home; that she bumped into her garage, touching it "lightly"; that she delayed responding to the officers' requests to answer her door; that, when she did answer, she was unclothed; and that, when she saw them, she ran to her bedroom. On those facts, any belief that defendant's life was endangered so as to necessitate immediate intervention would not be reasonable.

We have found only two cases in which the emergency aid exception was found to have justified a warrantless search of a conscious and distressed individual's property based on that individual's conduct. In *State v. De Aubre*, 147 Or App 412, 417, 937 P2d 125 (1997), we held that a true emergency justified a warrantless search of the defendant's "fanny pack" after police learned that the defendant had told a hospital employee that she had ingested a potentially lethal dose of prescription drugs, and that medical personnel needed to conduct the search to determine appropriate treatment. Unlike the present case, *De Aubre* involved a situation in which the defendant herself confirmed the existence of a life-threatening situation. In *State v. McDonald*, 168 Or App 452, 7 P3d 617, *rev den*, 331 Or 193 (2000), police conducted a search of the defendant's room after observing heroin-injecting paraphernalia near the defendant, noting that the defendant had recent needle marks on his arm, learning from the defendant's mother that he was a heroin addict who had only recently regained consciousness, and observing that the defendant was "hazy" and not necessarily out of danger from

an overdose. We concluded that "it was objectively reasonable for [the officer] to believe that his immediate assistance in determining the amount, variety, and combination of drugs taken by defendant was required to avert a life threatening drug overdose." *Id.* at 459-60. Again, the contrast with the present case is clear. Here, police did not testify about defendant's condition and had no reason to believe that she was seriously impaired, much less in mortal danger.

In sum, the warrantless entry into defendant's home violated her rights under Article I, section 9, of the Oregon Constitution; she did not consent to the search and it was not justified under the emergency aid exception to the warrant requirement.

Reversed and remanded.