Argued and submitted September 29, 2008, reversed and remanded April 22, 2009

## STATE OF OREGON,
*Plaintiff-Respondent,*

v.

## JARED ROBERT SNYDER,
*Defendant-Appellant.*

Washington County Circuit Court
C060808CR; A134006

206 P3d 1083

Ernest G. Lannet, Senior Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Legal Services Division, Office of Public Defense Services.

Susan G. Howe, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Brewer, Chief Judge, and Riggs, Senior Judge.

LANDAU, P. J.

**LANDAU, P. J.**

Defendant appeals a judgment of conviction for felon in possession of a firearm. ORS 166.270. He assigns error to the trial court's denial of a motion to suppress evidence obtained as the result of a warrantless search of his home. The court based its ruling on ORS 133.033, known as the "community caretaking" statute. Defendant contends that the court erred in relying on that statute because the statute, by itself, does not constitute an exception to the warrant requirement of Article I, section 9, of the Oregon Constitution. The state concedes the point, but argues that defendant did not preserve it. We conclude that defendant did preserve his claim of error and that, on the merits, the state's concession is well taken. We therefore reverse and remand.

The relevant facts are not in dispute for the purposes of this appeal. Defendant, who has a prior felony conviction for first-degree theft, lived in a duplex at 1432 SW 66th Avenue. His former girlfriend, S, was staying with him for a short time.

At approximately 3:00 a.m., S called a suicide crisis hotline from a pay phone at a convenience store. She told the hotline that she was headed for defendant's residence; that she was pregnant; that her boyfriend was there and that he possessed guns and drugs; and that she did not want police to respond because her boyfriend was abusive and had prior arrests.

The call was routed to the police, who responded by sending several officers to the scene. They arrived at 3:44 a.m. and divided into two teams, one that set up a loose perimeter around the house and another that prepared to approach the house. One of the officers, Sergeant Tannenbaum, watched the house through the scope on his rifle. He saw in the living room window a woman apparently sitting and watching television, but repeatedly getting up to walk back and forth in a circular fashion. Tannenbaum instructed the entry team to approach the house.

Four officers approached the front door, with guns drawn. S saw them as they approached and opened the front door, asking what was going on. The officers ordered S to

show her hands. They observed that she had superficial cuts on her wrists. S then told the officers to be quiet so as not to wake her boyfriend. The officers ordered her out of the house and placed her in handcuffs. One of the officers asked S whether she had called the crisis line. She said that she had, but that this "wasn't the response she wanted."

One of the officers yelled into the residence for any other occupants to come out with their hands up. A minute or so later, defendant appeared. The officers patted down defendant and took him into custody. The time was 4:20 a.m.

Two of the entry team then entered the house to do "a sweep of the house to make sure there was nobody else in the house." Tannenbaum later recalled that the sweep "was done primarily for our safety." During the sweep, the officers found a .22 caliber rifle propped up in a corner of an upstairs bedroom that was being used for storage.

The officers then brought defendant back inside of the home. They asked for consent to search the house for weapons. Eventually, defendant consented, and the police recovered, in addition to the rifle, a nine-millimeter handgun. Defendant's possession of the rifle, however, was the sole basis for the charge against him.

Defendant moved to suppress the evidence of the rifle obtained as a result of the warrantless search of his residence. The state responded that the search was justified by two exceptions to the warrant requirement: emergency aid and consent. In asserting its emergency aid argument, the state did not mention ORS 133.033. It relied on several cases discussing whether, under Article I, section 9, an emergency provides a constitutionally sufficient justification for warrantless entry.

Defendant responded:

"Your Honor, first of all, I would be happy to brief this further if it would be of assistance to the Court after hearing argument. I was aware that it was the State's burden. I thought of several possible ways they might want to justify this, and I didn't know exactly how they were going to justify it.

"They seem to be justifying the search either as a consent search or as an Emergency Aid Doctrine search, and I will address those two issues[.]

"* * * * *

"On the issue of Emergency Aid Doctrine, Your Honor, *State v. Follett*, [115 Or App 672, 840 P2d 1298 (1992), *rev den*, 317 Or 163 (1993)]. I have a copy of the case here if the Court wishes to review it. It is in fact, I believe, good law in Oregon.

"In the *Follett* case, Your Honor, as is always the case, the facts, the devil is in the details in these search cases. B[ut] there is a test outlined in *Follett* * * * where[,] one, the police must have reasonable ground to believe that there is an emergency and an immediate need for their assistance for the protection of life.

"Two, the emergency must be a true emergency. A good faith belief is not sufficient.

"Three, it must not be primarily motivated by an intent to arrest or seize. I don't think that was the case here.

"Four, officers must reasonably suspect that the area to be searched is associated with the emergency and would discover something that will alleviate the emergency.

"It is our position, Your Honor, that there is no true emergency in this case. If you look at some of the cases, I don't believe when the Emergency Aid Doctrine was * * * articulated, that this is the type of thing that the Court was looking for.

"* * * * *

"In this case, Your Honor, we know that [S] had identified herself. There was clear testimony of officers that she had. First of all, she had sa[t] quite a while, and you can get an idea of the time frame, but I think it was at 3:17 that the first call went into the dispatch, and it wasn't until substantially after 4:00 that officers went into the house.

"So when they arrive, there's really nothing unusual going on. She's in her home—in the home, I should say. The television is on. She appears, looks like she's watching television. There's no evidence articulated that this person, anyway, was injured in any way, was about to injure herself or anything else.

"Now of course at that moment in time they didn't know who the person in the living room was. But the person in the living room appeared not to be in the middle of an emergency."

The state responded that, under the facts, the officers were justified in believing that a true emergency did exist and that "[t]he officers did the very minimal necessary to secure the residence and during that, they saw a firearm and later learned the defendant was a felon."

The trial court then responded:

"Well, the key here appears to be ORS 133.033, in addition to what they have called the Emergency Aid Doctrine. They are very closely related. It's very similar, but I think the language of this statute is pretty straight forward, that the right to enter or remain upon premises of another if it reasonably appears to be necessary to prevent serious harm to any person or property is just as simple as that."

At that point, the following exchange occurred, as defendant responded to the trial court's introduction of the statute into the proceedings:

"[Defendant]: Your Honor, I think the Court is referring to a statute that deals with community caretaking function, and there's another whole body of law behind that.

"The Court: I understand. They changed the law because of the body of law on that. That's what the legislature did * * *.

"[Defendant]: I understand, Your Honor. It was my argument. I understand the Court's made a ruling. I think what I'd like the Court to focus on, and I suppose the Court's already focused on it, is there was an emergency that dissipated at the time they had her and she identified herself. There had been just total speculation.

"The Court: Right. I did not find that this was precisely the Emergency Aid Doctrine. I think it is a slightly different doctrine. I think this was the community caretaking function, which is identified by that statute and which this fact pattern does fit."

Defendant then asked the court, "for purposes of protecting the appellate record, we would ask the Court to make whatever findings of fact the Court is relying upon." The court declined. The court further explained that it was not reaching the state's contention that the search was justified by defendant's consent. Defendant was then tried, and convicted, on stipulated facts.

■ ■   On appeal, defendant argues that the trial court erred in denying his motion to suppress. According to defendant, the trial court erroneously relied on ORS 133.033, which he contends is not, by itself, an exception to the warrant requirement. Defendant argues that, as he contended before the trial court, an emergency justifies a warrantless search only under limited circumstances, which are not present in this case.

The state responds first by asserting that defendant's claim of error was not preserved. According to the state, it was incumbent upon defendant to assert to the trial court that ORS 133.033 is not an exception to the warrant requirement. On the merits, the state agrees that the trial court erred in denying defendant's motion to suppress.

■   We begin with the issue of preservation. As the Supreme Court explained most recently in *O'Hara v. Board of Parole*, 346 Or 41, 47, 203 P3d 213 (2009),

"[r]ules of preservation in court proceedings serve several purposes, including encouraging the parties to sharpen the issues and to present them fully and fairly to the trial court in the first instance, so that the trial court has an opportunity to make an informed ruling and develop an adequate record and the opposing party and the reviewing court are not taken by surprise later."

In this case, defendant argues that the trial court erred in rejecting his contention that the state failed to meet its burden of demonstrating the applicability of a recognized exception to the warrant requirement of Article I, section 9. Specifically, he argues that the state failed to demonstrate the applicability of the emergency aid exception. That is precisely what he argued to the trial court. He argued—quite thoroughly, as the foregoing excerpts from the hearing transcript make clear—the nature of the applicable test under

the cases discussing the emergency aid exception and the state's failure to meet all of the requirements of that test. When the trial court mentioned ORS 133.033, defendant insisted that the problem remained that there was no emergency. Defendant also asked the court to make specific findings in support of its ruling "for purposes of protecting the appellate record," but the trial court declined. Under the circumstances, it seems to us that all relevant issues were fully and fairly argued by the parties and that the trial court had an opportunity to make an informed ruling. We reject the state's contention that defendant did not adequately preserve his claim of error.

Turning to the merits, ORS 133.033 authorizes police officers to perform "community caretaking functions," which it defines as including "[t]he right to enter or remain upon the premises of another if it reasonably appears to be necessary to * * * [p]revent serious harm to any person or property." As we explained in *State v. Martin*, 222 Or App 138, 146, 193 P3d 993 (2008), *rev den*, 345 Or 690 (2009), although the statute authorizes police entries into homes and other premises, it does not constitute an exception to the warrant requirement of Article I, section 9:

> "* * * ORS 133.033 does not independently establish an exception to the warrant requirement. Rather, it provides legislative authorization for (among other things) a particular class of searches, subject to many of the same constitutional constraints that operate to limit other searches, including the warrant requirement. A lawful community caretaking search, in other words, must first be within the universe of police action described in ORS 133.033, and then it must also fall within one of the constitutional exceptions to the warrant requirement."

(Citation and internal quotation marks omitted.) In this case, as defendant argues—and as the state concedes—the trial court erroneously relied solely on the community caretaking statute, as if that statute creates an independent exception to the constitutional warrant requirement. Accordingly, the court erred in denying defendant's motion to suppress on that ground.

Defendant argues that we should remand with instructions to exclude the evidence of the rifle that the officers found in his house. The state notes that, even if the trial court erred in denying defendant's motion on the basis of the community caretaking statute, it is possible that the court still could—correctly—deny the motion on the ground that defendant consented to the search. Defendant responds that his consent is unavailing because it was tainted by the officers' unlawful exploitation of their illegal entry into his residence.

The problem with defendant's argument on that issue is that the trial court expressly limited its decision to the community caretaking statute and to its decision to reject defendant's emergency aid arguments. The court declined to rule on any issues related to the question whether defendant consented to the search. Particularly in light of the fact that the issue of consent may involve disputed issues of fact, we will not consider the issue for the first time on appeal.

Reversed and remanded.