Argued and submitted July 31, sentence vacated; remanded for resentencing; otherwise affirmed December 6, 2006

STATE OF OREGON,
*Respondent,*

*v.*

ANTHONY WAYNE BURDICK,
*Appellant.*

20-04-11705; A126404

149 P3d 190

David O. Ferry, Deputy Public Defender, argued the cause for appellant. With him on the brief were Peter A. Ozanne, Executive Director, and Peter Gartlan, Chief Defender, Legal Services Division, Office of Public Defense Services.

Anna M. Joyce, Assistant Attorney General argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Haselton, Presiding Judge, and Brewer, Chief Judge, and Rosenblum, Judge.

ROSENBLUM, J.

## ROSENBLUM, J.

Defendant appeals his conviction for unauthorized use of a vehicle, ORS 164.135, challenging the denial of his motion to suppress evidence and the validity of his sentence. Specifically, defendant argues that the warrantless entry by police into an apartment where they discovered a stolen motorcycle was not justified under the emergency aid doctrine, as the trial court concluded. Defendant also argues that the trial court erred by imposing a departure sentence based on judicially found aggravating factors in violation of his Sixth Amendment right to trial by jury. Although we conclude that the trial court correctly applied the emergency aid doctrine, we agree with defendant that his sentence was constitutionally infirm and reverse and remand for resentencing.

Although the trial court made no express findings of fact, we presume that the facts were decided consistently with the trial court's ultimate conclusion. *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968). We determine anew, however, whether the trial court correctly applied legal principles to those facts and permissible inferences from the facts. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). With those standards in mind, we recite the facts as testified to at the suppression hearing in the light most favorable to the state.

Early in the morning, the owner of a green motorcycle reported her motorcycle stolen in Eugene. Around 8:00 a.m., Eugene police were summoned to an apartment complex after residents reported that "disorderly subjects" were riding a green motorcycle behind the apartment complex. After speaking with the residents, the officers learned that a motorcycle had been hidden in the brush behind the apartment complex earlier that morning. Once they arrived on the scene, the officers saw a man run from the apartment complex.

The apartment complex manager, McElroy, also called the police after he saw a man with a knife enter apartment 33 through the front door, which he knew was occupied by a single female tenant who did not work, did not own a vehicle, and was "always there." After the man with the knife

entered apartment 33, McElroy knocked and pounded on the door but received no response. After the police arrived at the scene, they also tried, without success, to contact the tenant.

Because of the large number of officers involved in responding to the calls, Sergeant Harris was called to supervise. One of the officers at the scene told Harris that a man armed with a knife[1] had been seen entering apartment 33 by climbing through a rear window (contrary to McElroy's report—which had not been given to the police at that point—that the man had entered through the front door). Residents of the complex told the police that one of the two men seen riding the motorcycle was "probably" the person who climbed through the window.

Harris also learned that a man who had been seen frequenting apartment 33 was "acting kind of strange lately." Concerned for the tenant's safety, Harris decided to check on her. He knocked on the door and called out, but there was no response. A fellow officer then informed Harris that a motorcycle had been heard starting up nearby, and Harris sent the other officers at the scene to investigate while he remained at apartment 33. Because other officers had seen a man running away from the apartment complex, Harris did not expect to find the man with the knife inside the apartment. He testified that he was "concerned about somebody injured in the residence."

After receiving no response to his knocking on the apartment door, Harris asked McElroy to let him in. McElroy unlocked the exterior lock on the front door, but the door was blocked from the inside. Harris then learned from other residents of the complex that "the window * * * to that particular apartment was open and in the back." He walked around back, looked inside, and saw a man lying on a bed. Harris told the man that he needed to speak to him at the front door.

Harris returned to the apartment's front door to find it now unlocked and slightly ajar, so he pushed the door open

---

[1] Sergeant Harris testified, "[W]e didn't have any idea what type of knife was seen with this person. We didn't know whether it was a sheath knife, a pocket knife, or anything, we just knew that supposedly someone had a knife and crawled through a window."

to look inside the apartment. As he stood in the doorway, he saw the person he had spoken to in the back bedroom walking down the hall and asked him where the female resident was. The man pointed down the hallway, and Harris told him that he needed to speak with her.

While standing in the doorway, Harris also saw a green motorcycle in the kitchenette of the apartment, which was adjacent to the front door. He then noticed a second man asleep on the living room couch. Harris informed the other officers in the area of his discovery and summoned them back to the apartment. During the investigation that followed, the police discovered defendant hiding in the female tenant's bedroom. He was subsequently identified by a witness as one of the men seen riding the motorcycle.

Defendant was arrested and charged with unauthorized use of a vehicle, ORS 164.135. Before trial, defendant moved to suppress all evidence obtained by Harris after he pushed open the apartment door and observed the green motorcycle inside. The trial court held "that the police had reasonable grounds to believe that there was an emergency[,] that immediate need for their assistance for the protection of life was necessary" and that "the emergency was a true emergency." The trial court denied defendant's motion to suppress.

Also before trial, the state filed an "Allegation of Aggravating Circumstances Justifying Departure Sentence" and argued that defendant's alleged persistent involvement in similar offenses and the fact that defendant was on post-prison supervision at the time he allegedly committed the crime justified imposition of an upward departure sentence. Defendant objected, arguing that he was entitled under the Sixth Amendment to have the alleged aggravating circumstances found by a jury before an upward departure sentence was imposed. *See Blakely v. Washington*, 542 US 296, 124 S Ct 2531, 159 L Ed 2d 403 (2004) (concluding that it violates the Sixth Amendment to impose an upward departure sentence based on facts not found by a jury or admitted by the defendant); *State v. Sawatzky*, 195 Or App 159, 96 P3d 1288 (2004) (applying *Blakely* to Oregon's sentencing guidelines).

The trial court determined that the aggravating circumstances were not a question for the jury under *Blakely*.

Evidence of the motorcycle was introduced at trial, and defendant was convicted by a jury of unauthorized use of a vehicle. At sentencing, defendant reiterated his objection to the imposition of an upward departure sentence and asked the court to impose, instead, the presumptive sentence of 13 months in prison. The state requested a 26-month prison term based on aggravating factors other than prior convictions, and the court sentenced defendant accordingly.

■■ We first address defendant's argument that the trial court erred by failing to suppress evidence of the motorcycle because Harris's entry into the apartment was not authorized by a warrant. A warrantless search is *per se* unreasonable under Article I, section 9, of the Oregon Constitution unless it falls within a recognized exception to the warrant requirement. *State v. Voits*, 186 Or App 643, 648, 64 P3d 1156, *rev den*, 336 Or 17 (2003), *cert den*, 541 US 908 (2004). We have previously held that the emergency aid doctrine exception to the warrant requirement permits the state to use evidence seized pursuant to a warrantless intrusion in a criminal prosecution if:

"(1) The police * * * have reasonable grounds to believe that there is an emergency and an immediate need for their assistance for the protection of life.

"(2) The emergency [is] a true emergency—the officer's good faith belief alone is insufficient.

"(3) The search [is not] primarily motivated by an intent to arrest or to seize evidence.

"(4) The officer * * * reasonably suspect[s] that the area or place to be searched is associated with the emergency and that, by making a warrantless entry, the officer will discover something that will alleviate the emergency."

*State v. Follett*, 115 Or App 672, 680, 840 P2d 1298 (1992), *rev den*, 317 Or 163 (1993). Defendant concedes that Harris's entry into the apartment was not motivated by the intent to

arrest or seize evidence and that Harris reasonably suspected that the apartment was associated with the emergency, but he contends that there was no true emergency and the police lacked a reasonable basis to believe that there was.

The first two prongs of the *Follett* test require us to determine whether the circumstances actually existing at the time Harris entered the apartment by pushing open the front door supported an objectively reasonable belief that his action was immediately required to protect life. *See, e.g., State v. Martofel,* 151 Or App 249, 252, 948 P2d 1253 (1997) ("[A] 'true emergency' exists if the circumstances present grounds for an officer to reasonably believe that immediate police action is required.").

In the cases in which we have approved the application of the emergency aid doctrine, objective indicia of a particular individual being in distress or of the presence of a potentially dangerous individual suggested that immediate action was required to protect life. Conversely, we have declined to apply the doctrine in cases in which none of the officers' perceptions and no reliable witness accounts suggested that any particular person was at risk of harming or being harmed. *Compare State v. Russell,* 118 Or App 652, 848 P2d 657, *rev den,* 317 Or 272 (1993) (approving the use of the emergency aid doctrine where the police officer was unable to rouse a woman he could see lying on a couch inside a house he knew was occupied by unattended children), *with State v. Christenson,* 181 Or App 345, 350-52, 45 P3d 511 (2002) (concluding that, absent indications of forced entry, a medical emergency, or "other signs of trouble," the circumstances of dogs running loose, an open front door, and silence from the house did not constitute a "true emergency"). Thus, a "true emergency" exists if there are reliable, objective indicia of a potential victim of a dangerous circumstance or a potential perpetrator of a dangerous act. Suspicious circumstances or "gut instinct" are insufficient. The existence of an identifiable victim or perpetrator is significant because whether an emergency exists depends on whether immediate action is required ("something that will alleviate the emergency"), which, in turn, depends on the relationship between the gravity of the harm to be prevented and the probability that the harm will occur if action is not taken. *See Webster's Third*

*New Int'l Dictionary* 741 (unabridged ed 2002) (defining "emergency" as "an unforeseen combination of circumstances or the resulting state that calls for immediate action"). In the absence of either a potential victim or a perpetrator (or other objective indicia of an immediate need for action to protect life), both the risk and gravity of harm to human life are purely speculative.

■ In this case, Harris identified both a potential victim (the woman tenant of the apartment) and a potential perpetrator (the man with the knife). Thus, the emergency aid doctrine justified Harris's initial intrusion into the apartment by opening the back bedroom window, pulling aside the curtains, and looking inside. The parties have not argued otherwise. At that time, Harris reasonably believed that it was immediately necessary to enter the apartment to render assistance, based on reliable, objective indicia of a "true emergency." Residents of the complex identified a particular potential perpetrator: the man armed with a knife. In addition, the residents identified a particular potential victim: the woman who "was always there." We have previously held that "silence * * * does not suggest a reason for concern or lack of concern. It is completely neutral." *Christenson*, 181 Or App at 351. However, in that case, the officers had no reason to believe that any particular individual was inside the house. Here, Harris was told that the woman who lived in the apartment was *always* at home. Under those circumstances, the fact that no one responded to repeated pounding on the door made it reasonable to believe that the tenant may have been harmed. Silence, when one has no particular reason to expect a reply, is a neutral factor. But when there is reason to expect a reply, it suggests that something is amiss. We are mindful that we must presume that the trial court drew all permissible inferences in favor of the state, including the inference that the fact that efforts to contact the occupant of apartment 33 met with silence suggested that the woman inside the apartment could not respond because she had been injured or was being held hostage.

■ The more difficult question is whether the "true emergency" continued; that is, after looking through the window and seeing a man lying on the bed, did circumstances still support a reasonable belief by Harris that the woman

inside the apartment was in danger? *See State v. Will,* 131 Or App 498, 501-04, 885 P2d 715 (1994) (explaining that, while the officers' initial entry into an apartment where they believed a domestic disturbance was occurring was valid under the emergency aid doctrine, their second entry after learning that the victim had left the apartment was unlawful). We believe they did.

■　　Defendant argues that Harris's additional observations when he looked through the window were inconsistent with the likelihood that life-threatening violence had just occurred in the apartment, and thus Harris's belief that a woman was injured inside the apartment was no longer reasonable. The state, on the other hand, takes the position that the fact that a man was lying on a bed in a back room does not demand the conclusion that the woman inside the apartment was safe. We agree with the state. One might reasonably infer that the man with the knife sneaked into the apartment and harmed the woman in a different room, without disturbing the man on the bed, particularly considering that one possible explanation for the failure of the man on the bed to respond to knocking and pounding on the front door was that he had been sleeping deeply.[2] Another possible inference might be that, although Harris initially believed that the man with the knife had left the apartment before he (Harris) looked in the window, he may have concluded otherwise after observing the man on the bed, especially when he could have inferred that the man had declined to answer the front door to avoid police scrutiny. A competing inference that the man on the bed was not the intruder and that his presence had prevented an attack on the woman was also a possibility, but it was not the only one. *See State v. Torres,* 201 Or App 275, 287, 118 P3d 268 (2005), *rev den,* 340 Or 308

---

[2] Defendant makes much of the fact that McElroy testified that he reported that a man entered through the front door while Harris testified that he was told, by others, that the man had climbed through the rear bedroom window. We decline to address defendant's argument that knowledge of the contents of McElory's report should be imputed to Harris because we conclude that Harris's actions would have been justified under the emergency aid doctrine even if he had believed the man had entered through the front door and even if he had received conflicting stories about how the man with the knife had made his way into the apartment.

(2006) (police officers are not required to eliminate all possible innocent explanations). Thus, we conclude that Harris's belief that the woman was inside the apartment and might be seriously injured continued to be reasonable after his additional observations. Harris's entry without a warrant was, therefore, justified under the emergency aid doctrine.

Defendant also assigns error to his sentence, arguing that the trial court violated his Sixth Amendment right to trial by jury by imposing, over defendant's objection, an upward departure sentence based on aggravating factors that were neither admitted by defendant nor found by a jury. The state concedes that we have agreed with that argument in other cases but invites us to reconsider those decisions. *See, e.g., State v. Bray*, 197 Or App 12, 19-20, 104 P3d 631 (2005), *rev allowed*, 340 Or 672 (2006); *Swatazky*, 195 Or App at 172. We decline that invitation. The trial court erred by imposing an upward-departure sentence based on judicial findings of defendant's persistent involvement in similar offenses and his status of being on post-prison supervision.

Sentence vacated; remanded for resentencing; otherwise affirmed.