Argued and submitted May 22, Lakeview High School, Lakeview, reversed and remanded November 5, 2008

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

NICHOLAS ALAN SALISBURY,
*Defendant-Appellant.*

Washington County Circuit Court
D062190T; A133695

196 P3d 1017

Kristin A. Carveth, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Legal Services Division, Office of Public Defense Services.

Tiffany Keast, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Edmonds, Presiding Judge, and Sercombe, Judge, and Simpson, Judge pro tempore.

EDMONDS, P. J.

## EDMONDS, P. J.

Defendant appeals from a judgment of conviction for driving under the influence of intoxicants (DUII). ORS 813.010. Defendant argues that the trial court erred in denying his motion to suppress evidence obtained after officers entered his residence without a search warrant. We review for errors of law, ORS 138.220, and conclude that the officer's entry into defendant's apartment violated Article I, section 9, of the Oregon Constitution. We therefore reverse and remand.

The trial court made extensive findings of historical fact in support of its legal determination that Article I, section 9, was not violated. Because those findings are supported by the evidence in the record, we accept them as an accurate description of what actually transpired. Also, where the court did not make express findings, and there is evidence from which such facts could be decided in more than one way, we will presume that those factual disputes were decided in a manner consistent with the trial court's ultimate conclusion. *State v. Stevens*, 311 Or 119, 126-27, 806 P2d 92 (1991); *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968). Finally, we include in the statement of facts for purposes of this opinion those facts that are unconverted in the record.

At approximately 2:45 a.m., Officer Miller of the Hillsboro City Police Department was in his patrol car when he saw a car abruptly stop at a signal light at an intersection. He suspected that the car had exceeded the 35 mile-per-hour speed limit as it approached the intersection. From his vantage point, he could see well enough to observe the appearance of the person driving the car. After conducting a computer check of the car's license plate, he was able to match the description of the driver with that of the registered owner, and he learned that the registered owner resided at a nearby apartment complex. Miller also discovered that the registered owner did not have an Oregon driver's license, which is a violation of Oregon law but not a criminal offense. After obtaining the above information, Miller turned his patrol car around and drove to the registered owner's address.

As Miller arrived at the address, he saw defendant as he was getting out of the driver's side door of the car that

he had observed at the intersection. Miller also observed that defendant's appearance was similar to the description of the registered owner. Miller called out to defendant, using the first name of the registered owner. Defendant responded, "What? * * * I didn't do anything," and quickly walked away from Miller. Miller followed defendant up the stairs leading to defendant's apartment, while informing defendant that he needed to speak with him. Nonetheless, defendant continued to move rapidly up the stairs to his third-floor apartment, went into the apartment, and closed the door behind him. The trial court found that "[t]he officer went to the door, arrived shortly before it was closed, and heard the lock being engaged and knew that it had been locked."

The trial court further found,

"But then the next few minutes after that Officer Miller heard a female voice screaming, heard someone use a profanity, heard yelling and screaming with both a male and a female voice.

"What the officer described as sounds of someone being in peril, which is—I think Officer Miller has been reading too many novels. That word is not a real modern word, but I think I get the message that he thought someone was in danger and might be about to get hurt in there.

"So he was concerned about that. He could hear that even when he got back to his patrol car several stories down, three stories down. So, he was concerned about the safety of the people within the unit."

Miller announced that he was a police officer and that he needed to speak with defendant. After no one came to the door in response to Miller's statements, he returned to his patrol car and contacted the dispatcher. Miller tried unsuccessfully to find a phone number for the apartment so he could call to check on the occupants. He was also unable to contact the apartment manager. Defendant's neighbors testified that they heard yelling from the apartment and, according to the trial court's finding, "at least one loud noise, a thud, that was not specifically identified, * * * that went on for some period of up to five minutes[.]"[1] Other police officers

---

[1] The record does not disclose whether that information was communicated to the officers before they entered defendant's apartment.

arrived at the scene to assist Miller, among them Officer Garcia, who positioned himself below and behind defendant's apartment.

According to the trial court,

"The next sequence of events, there's approximately a 15 to 20 minute time period when the officers pound on the door, announced that they were police officers, requested first and then ordered defendant to open the door. There was no response. The door was not opened.

"Apparently during that time period[,] the—according to [defendant,] he was in the bedroom. He did hear the police officers. He knew they were at the door. He just chose—as he had outside when the officer first tried to talk to him, just chose not to participate and not cooperate with the police officers."

From his position behind the apartment, Garcia could hear mumbling and talking within the apartment, although he could not hear what was being said. Garcia reported what he heard to Miller and the other officers who arrived on the scene. When Miller returned to the apartment door with the other officers, Garcia saw the lights go out in the apartment and, from his position, he could clearly hear the officers pounding on the door. Again, Garcia reported his observations to the other officers.

The trial court found that, after the officers tried for 15 to 20 minutes to persuade the occupants of the apartment to open the door,

"[t]he officers finally forced the door open, found the defendant in the bedroom, still with his bedroom door closed, lying on the floor, but making no effort to resist. * * *

"They did find a young female who was on the bed crying, was obviously distressed, obviously had been involved in some confrontation with the defendant prior to the police officers arriving."

Defendant was taken into custody as soon as the officers entered the bedroom. The woman in the apartment was not physically injured. After taking defendant into custody, officers observed a strong odor of alcohol coming from his

breath. Consequently, field sobriety tests were administered to defendant, which he failed. Based on his failure of the tests, defendant was charged with and convicted of DUII.

Before trial, defendant filed a motion to suppress any evidence that was discovered after the officers entered his apartment and that tended to show that he was under the influence of intoxicants. Defendant argued that the police violated his constitutional rights against unlawful search and seizure under Article I, section 9, and the United States Constitution by entering his apartment without a search warrant. The state contended that the entry was lawful under the emergency aid doctrine and the community care-taking statute, ORS 133.033. The trial court denied the motion to suppress, reasoning:

> "If you evaluate the officers' actions at the point where [defendant] locked that door and the screaming occurred, before the pounding on the door started, then they may have had clear reason to go in. They may not.

> "But for me, once they've knocked and announced repeatedly and repeatedly for 15 minutes, and he still doesn't come to the door and say there's nothing wrong here, that gives them overwhelming probable cause and good cause to do their duty.

> "I can imagine what kind of letters we would get from the citizens in the community if they found out that police officers had walked away from that door after 15 minutes of pounding and there was just silence, and then somebody had found the bodies the next day.

> "* * * [T]hey know that someone is in there, they know there's been shouting, and the people just simply refuse to come to the door. * * * But it's their job to kick in the door and make sure everything is all right."

■■ We appreciate the trial court's sensitivity to the circumstances that existed, but we are obligated to apply the applicable rules of law as the state and federal constitutions require. The above findings frame the legal determination before us. Our task is to decide whether the trial court's legal conclusion based on those findings is correct. Because our decision under the Oregon Constitution is dispositive, we turn first to its provisions. Article I, section 9, prohibits

unreasonable searches and seizures. In order to search a person's residence without a search warrant, the police must act within one of the established exceptions to the warrant requirement of Article I, section 9.[2] *Stevens*, 311 Or at 126. The state bears the burden of proving that an exception to the search warrant requirement exists. *Id.*

The state argues that the officers were justified in entering defendant's apartment pursuant to their community caretaking function, ORS 133.033(2)(a), and pursuant to the "emergency aid doctrine." ORS 133.033 provides, in part:

"(1)  Except as otherwise expressly prohibited by law, any peace officer of this state, as defined in ORS 133.005, is authorized to perform community caretaking functions.

"(2)  As used in this section, 'community caretaking functions' means any lawful acts that are inherent in the duty of the peace officer to serve and protect the public. 'Community caretaking functions' includes, but is not limited to:

"(a)  The right to enter or remain upon the premises of another if it reasonably appears to be necessary to:

"(A)  Prevent serious harm to any person or property;

"(B)  Render aid to injured or ill persons; or

"(C)  Locate missing persons."

As we held in *State v. Martin*, 222 Or App 138, 146, 193 P3d 993 (2008),

"ORS 133.033 does not independently establish an exception to the warrant requirement. Rather, it provides legislative authorization for (among other things) a particular class of searches, subject to many of the same constitutional constraints that operate to limit other searches, including the warrant requirement. A lawful community caretaking search, in other words, must first be within the universe of police action described in ORS 133.033, and then it must also 'fall within one of the constitutional exceptions to the warrant requirement.' [*State v.*] *Goodall*, 219 Or App [325], 334[, 183 P3d 199 (2008)]."

---

[2] Article I, section 9, of the Oregon Constitution guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"

Thus, even if the state is able to satisfy the requirements of ORS 133.033, it must also satisfy the requirements of the emergency aid doctrine. In *State v. Follett*, 115 Or App 672, 680, 840 P2d 1298 (1992), *rev den*, 317 Or 163 (1993), we recognized the emergency aid doctrine as an exception to the warrant requirement of Article I, section 9, if four conditions are met:

"(1) The police have reasonable grounds to believe that there is an emergency and an immediate need for their assistance for the protection of life;

"(2) The emergency must be a true emergency—the officer's good faith belief alone is insufficient;

"(3) The search must not be primarily motivated by an intent to arrest or to seize evidence;

"(4) The officer must reasonably suspect that the area or place to be searched is associated with the emergency and that, by making a warrantless entry, the officer will discover something that will alleviate the emergency."

Moreover, in *State v. Burdick*, 209 Or App 575, 581, 149 P3d 190 (2006), we explained that

"a 'true emergency' exists if there are reliable, objective indicia of a potential victim of a dangerous circumstance or a potential perpetrator of a dangerous act. Suspicious circumstances or 'gut instinct' are insufficient. The existence of an identifiable victim or perpetrator is significant because whether an emergency exists depends on whether immediate action is required ('something that will alleviate the emergency'), which, in turn, depends on the relationship between the gravity of the harm to be prevented and the probability that the harm will occur if action is not taken."

Here, the trial court implicitly found that the officers held the subjective belief that the law requires. But, for a "true emergency" to exist within the meaning of the emergency aid doctrine, there must be "objective indicia of a particular individual being in distress or of the presence of a potentially dangerous individual" such that "immediate action was required to protect life." *Id.*

■     With that issue in mind, we turn to whether objective indicia of a true emergency existed at the time the officers entered defendant's apartment. Miller suspected that defendant had driven his car without a valid Oregon license and had been speeding in the early morning hours. The officers knew that defendant had refused to cooperate with Miller in the parking lot, while he was climbing the stairs to his apartment, and after he entered his apartment. The officers also knew, according to the findings of the trial court, that Miller had "heard a female voice screaming, heard someone use a profanity, heard yelling and screaming with both a male and female voice" from within the apartment—conduct that lasted approximately five minutes. The officers were also aware of the information that came from Garcia. Finally, within their knowledge was the 15- to 20-minute time period when they attempted to contact the occupants of the apartment, and no one responded.

    The officers were also aware that defendant was not an intruder in the apartment and that he resided there. The only offense that they were aware he had committed was a traffic offense. Significantly, the police did not testify that they heard any sounds of a physical struggle or an indication that an act of violence had occurred inside the apartment. Moreover, no occupant of the apartment requested assistance from the police, even though the police made their presence known over a significant time period. It is correct, as the state argues, that it could be inferred that, because the lights were turned off and there were no longer any sounds coming from the apartment, the screaming woman inside the apartment was unable to respond to their inquiries due to injury or restraint; however, that inference is counterbalanced by the inference that what the police heard was evidence of a domestic quarrel that did not require their intervention.

■     It is in the context of these difficult circumstances that we turn to the law for instruction. The controlling legal principle in this case is that warrantless entries and searches of private residences are *per se* unreasonable unless the state carries its burden of showing that the circumstances existing at the time of entry invoke an exception to the warrant requirement. *State v. Davis*, 295 Or 227, 237, 666 P2d 802 (1983). There is no objective evidence in this case that the

officers' entry into defendant's apartment was immediately required to protect a person from harm or risk of harm, other than Miller's testimony that he thought someone was in "peril." Unfortunately, the record made by the state does not further explain why Miller reached his conclusion. Under the circumstances, the state has not carried its burden of demonstrating that the emergency aid doctrine applies. It necessarily follows that the entry by police into defendant's apartment was unlawful and that his motion to suppress the evidence derivative of that entry should have been granted.

Reversed and remanded.