Submitted August 25, 2009, reversed and remanded September 22, 2010, petition for review allowed March 4, 2011 (349 Or 663)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

HEZAKIAH BENJAMIN BAKER,
*Defendant-Appellant.*

Jackson County Circuit Court
071766AFE; A137073

240 P3d 735

Garrett A. Richardson, Multnomah Defenders, Inc., filed the brief for appellant.

John R. Kroger, Attorney General, Erika L. Hadlock, Acting Solicitor General, and Ryan Kahn, Assistant Attorney General, filed the brief for respondent.

Before Haselton, Presiding Judge, and Armstrong, Judge, and Rosenblum, Judge.

ARMSTRONG, J.

**ARMSTRONG, J.**

Defendant appeals his convictions for unlawful delivery of marijuana, ORS 475.860(2) (2007), and endangering the welfare of a minor, ORS 163.575. He assigns error to the trial court's denial of his motion to suppress evidence that police officers obtained after entering his residence without a search warrant. We review the suppression ruling for legal error and conclude that the officers' entry into defendant's residence violated Article I, section 9, of the Oregon Constitution. We therefore reverse and remand.

The trial court made few findings. However, its findings are supported by the record, and, thus, we accept them. *State v. Salisbury*, 223 Or App 516, 518, 196 P3d 1017 (2008). We presume that other pertinent facts were decided in a manner consistent with the trial court's ultimate conclusion. *State v. Burdick*, 209 Or App 575, 577, 149 P3d 190 (2006). We relate the facts accordingly.

In April 2007, Officer Venables of the Medford Police Department responded to a call from dispatch about a domestic disturbance. According to the dispatcher, a person claiming to be Turnage's neighbor had called 9-1-1 to report that she could hear yelling or screaming coming from Turnage's house and that Turnage had used a prearranged code word to tell the neighbor that she was in trouble and needed immediate police assistance. The caller also reported the possibility that a two-and-one-half-year-old child was at the residence. Based on that information, Venables believed that there was an emergency that required a quick response, and he sped in his patrol car to Turnage's house using emergency lights and sirens.

A second officer, Wileman, was also dispatched. Wileman had used code words while growing up with his family and understood them to be used only in situations that were "pretty important."

The officers parked their patrol cars down the street from Turnage's house and walked to it. As they approached, they saw two people, a man and a woman, sitting on the front porch of the house; the officers could hear yelling coming from inside, but they could not make out what was being

said. The pair on the porch was not involved in the disturbance, but they reported that they had been inside the house. Venables asked the pair questions in order "to figure out * * * exactly what was going on." However, the record indicates only that the people confirmed that an argument "was going on inside the residence." They did not say anything about weapons, injuries, or threats of violence, nor did they express any concern for the well-being of the people inside the house. Venables could not recall whether he had asked the pair if anyone inside the house had been hurt.

Venables tried the front door but found it locked. He did not knock on the door or ring the doorbell, for fear of aggravating the situation. Instead, he asked the people on the front porch how he could get into the house, and they told him that he could get in through the back door. Both officers testified that, at that point, they believed that there was an emergency and that they needed to make contact with the people inside the house as quickly as possible. Wileman testified that "it sounded to [him] like [it] was one of those fights that could escalate into something possibly violent." Similarly, Venables testified that, based on the dispatch report of a woman possibly in danger, the yelling in the house, and the possible presence of a young child, he felt it necessary to ensure that "the parties were okay inside."

The officers then walked around toward the back of the house. On their way to the back door, the officers were able to see Turnage and defendant through a side window of the house. At that point, Wileman "could still hear yelling" between the couple, however he "couldn't hear words * * * [and] couldn't tell * * * what they were saying."

On reaching the back door, Venables could see Turnage and defendant through a window in the door. Defendant's back was turned to the officers; however, Turnage saw the officers and shouted, "Cops!" Defendant reacted quickly and began taking buds off of what appeared to be a marijuana plant, placing them in a box near the door. The officers then opened the door, identified themselves, and entered the house.

The officers separated the two and questioned them. After speaking with them, the officers quickly determined

that there had been no assault between Turnage and defendant and saw that both were free of any red marks or bruises. The officers asserted that their first priority was ascertaining the safety of all of the affected people, including the two-and-one-half-year-old child who might have been in the house. Once they were satisfied that no one was injured, they turned their attention to the marijuana. In addition to the marijuana plants in the kitchen, the officers found several more in other rooms in the house.

Defendant was charged with five crimes, all related to the presence of the marijuana plants. Before trial, he moved to suppress evidence of the marijuana plants. Defendant raised several arguments, including that there was no true emergency or exigency justifying entry into the rear of the residence. The court denied the motion, concluding that the officers' entry into defendant's home was lawful under the emergency aid exception to the warrant requirement.

■■■ Article I, section 9, of the Oregon Constitution requires the police to obtain a warrant before conducting a search unless a recognized exception to the warrant requirement applies. *See, e.g.*, *State v. Stevens*, 311 Or 119, 126, 806 P2d 92 (1991). One such exception is the emergency aid exception. Under that exception, police are authorized to make a warrantless entry into property if:

> "(1) the police have reasonable grounds to believe that there is an immediate need for their assistance for the protection of life; (2) there is a 'true emergency'—that is, the circumstances giving rise to the police's belief that action is necessary actually exist; (3) the search is not primarily motivated by an intent to arrest a person or seize evidence; and (4) the police reasonably believe that, by making the warrantless entry, they will discover something that will alleviate the emergency."

*State v. Bentz*, 211 Or App 129, 135, 158 P3d 1081 (2007). Suspicious circumstances or an officer's "gut instinct" are insufficient to establish the reasonableness of an officer's belief that immediate action is necessary to protect life. *Burdick*, 209 Or App at 581. Further, when the emergency aid doctrine is invoked to justify a warrantless entry into a

home, "the state must make a strong showing that exceptional emergency circumstances truly existed." *State v. Miller*, 300 Or 203, 229, 709 P2d 225 (1985), *cert den*, 475 US 1141 (1986).

■■ Here, only the first two elements of the emergency aid doctrine are at issue. To satisfy those elements, the police officers must have believed that immediate intervention by them was necessary to protect a person's life and their belief of that, evaluated at the time of entry, must have been objectively reasonable. *See, e.g., State v. Martin*, 222 Or App 138, 148, 193 P3d 993 (2008), *rev den*, 345 Or 690 (2009). As explained below, we conclude that those requirements were not satisfied in this case. That is because, even assuming without deciding that, when the officers arrived at the home, sufficient objective indicia of an emergency existed to justify a warrantless entry, by the time that the officers entered the house, their belief that there was a life-threatening emergency requiring their intervention was not objectively reasonable.

We recognize that, if objective indicia of a life-threatening emergency were present up to the point that the officers reached the back door of the house, then their entry into the house and seizure of the marijuana plants conceivably could have been justified under the plain view and exigent circumstances doctrines. *See, e.g., State v. Walle*, 52 Or App 963, 967, 630 P2d 377 (1981). However, if the officers' belief about a life-threatening emergency became unreasonable after they saw defendant and Turnage arguing through the side window of the house, then the officers lacked authority under the emergency aid doctrine to proceed to the back door. *See State v. Ohling*, 70 Or App 249, 252, 688 P2d 1384, *rev den*, 298 Or 334 (1984) (noting that an officer ordinarily may not approach the side or rear of a home without a warrant or some other legal justification). Thus, our examination of the purported emergency focuses on the totality of the circumstances that existed when the officers looked into the house through the side window.[1]

---

[1] Venables testified that he did not see the marijuana plants in the kitchen until he had reached the back door of the house.

To review, on arriving at the side of the house, the officers knew the following. A person claiming to be a neighbor had called 9-1-1 to report yelling and screaming at Turnage's house and that a two-and-one-half-year-old child might be present. The person had reported that Turnage had used a prearranged code word indicating that she was in trouble and needed immediate police assistance. When the officers arrived, they heard yelling from inside the house but could not describe what was being said. There is no indication in the record that any of the sounds that the officers heard were suggestive of a physical struggle. Also, on their arrival, the officers met a woman and man on the front porch of the house who explained that they had previously been inside the house. In response to questioning about "exactly what was going on," the people on the porch did not provide any information about weapons, injuries, or threats of violence, nor did they indicate that police intervention was necessary to prevent harm. Subsequently, while en route to the back door, the officers stopped at the side of the house where they could see through a window that defendant and Turnage were arguing inside. At that point, the officers still could not make out what was being said. Significantly, nothing indicates that the officers saw any signs of physical conflict, visible injuries, brandished weapons, or a fearful victim.

We appreciate that those facts present a close question, to which the trial court was duly sensitive. However, on those facts, we conclude that the officers' belief that a danger to life existed, which necessitated their immediate intervention, was not objectively reasonable. Specifically, once the officers reached the side of the house, their belief that immediate intervention was necessary was no longer supported by objective indicia that a life-threatening emergency existed. Rather, the circumstances demonstrated only that defendant and Turnage were engaged in a verbal, albeit heated, argument. Accordingly, we conclude that the state has failed to carry its burden to "make a strong showing that exceptional emergency circumstances truly existed." *Miller*, 300 Or at 229.

On appeal, the only exception to the warrant requirement that the state advances to support affirmance of

the trial court's suppression ruling is the emergency aid doctrine. Specifically, the state asserts that, because "the evidence supporting the emergency aid-exception can be inferential," here, "the loud arguing coming from inside the house, combined with the report of a 'code word,' was sufficient to support the officer's belief that assistance was needed to protect life." We disagree. When the officers saw through the side window that the couple was engaged in only a verbal, nonviolent argument unaccompanied by other evidence indicative of life-threatening violence, it ceased to be objectively reasonable for the officers to believe that immediate intervention by them to protect life was necessary.

Furthermore, the addition of the code word does not affect that conclusion. No evidence in the record indicates what the code word or phrase was or the range of circumstances that would precipitate Turnage's use of it. Without more information to indicate otherwise, Turnage's use of the code indicates only that she wanted police assistance, not that a life-threatening emergency existed. Hence, in the circumstances presented here, the combination of the yelling and use of a code word are insufficient to support an objectively reasonable inference that immediate intervention was necessary to protect life.

The trial court relied, in part, on *State v. Agnes*, 118 Or App 675, 848 P2d 1237 (1993), in concluding that the officers permissibly entered the premises under the emergency aid doctrine. In *Agnes*, police officers responded to a neighbor's call, in which the neighbor described "banging, yelling and screaming" coming from a house. When they knocked on the front door, a man told them to go away and a woman told them to leave her alone. The officers persisted in knocking, while the man screamed obscenities, yet they still did not enter. Finally, the woman opened the door a few inches, and the officers could see that "[s]he was wrapped in a quilt and her hair was in disarray," and though "[s]he said that she was fine, * * * she appeared to be frightened." The officers could also see that furniture was in disarray, that "the television was 'halfway falling off the counter,' " and that the defendant was intoxicated, lying on a couch. Only then did the officers push open the door and enter the home, where they discovered cocaine on the defendant's table. We concluded that,

under those circumstances, the officers' entry was a reasonable response to "a true emergency that created an immediate need for their assistance for the protection of life." *Id.* at 679 (internal quotation marks omitted).

The circumstances presented in this case are markedly different from those in *Agnes*, and the differences indicate that the trial court's reliance on *Agnes* was misplaced. First, the neighbor in *Agnes* told the police that, in addition to "yelling and screaming," the neighbor specifically heard "banging" sounds coming from the residence—that is, sounds that could be consistent with a physical struggle. Here, the officers were not told by the neighbor or the couple on the porch that they had heard any sounds of a physical struggle, and, further, the officers themselves never heard any noises indicating violence. Second, unlike the officers in *Agnes*, here the officers did not knock on the front door but merely proceeded to the back of the house after finding it locked. Finally, contrary to the circumstance in *Agnes*, once the officers did get a view inside the house and saw the arguing couple, they saw none of the signs of violence present in *Agnes*. There was no upset furniture, no intoxicated person, and no disheveled, frightened victim. In short, in *Agnes* there were indicia of prior and potential violence while, here, the officers had no evidence of a violent situation beyond "yelling and screaming" and the knowledge that a code word had been used to request police assistance.

In sum, we conclude that the trial court erred in concluding that the officers' entry into defendant's residence was justified under the emergency aid doctrine. Accordingly, the officers' entry was unlawful, and defendant's motion to suppress the evidence seized as a result of that entry should have been granted.

Reversed and remanded.