Argued and submitted May 28, reversed and remanded November 17, 2010,
petition for review denied March 25, 2011 (350 Or 131)

## STATE OF OREGON,
*Plaintiff-Appellant,*

*v.*

## MOHAMED TAWFIQ SAID TABIB,
*Defendant-Respondent.*

Marion County Circuit Court
08C44691; A140965

243 P3d 814

Tiffany Keast, Assistant Attorney General, argued the cause for appellant. With her on the brief were John R. Kroger, Attorney General, and Jerome Lidz, Solicitor General.

Erica Herb, Deputy Public Defender, argued the cause for respondent. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Before Landau, Presiding Judge, and Ortega, Judge, and Sercombe, Judge.

ORTEGA, J.

## ORTEGA, J.

The state appeals an order granting defendant's motion to suppress evidence discovered after sheriff's deputies, responding to a report of a domestic disturbance and acting without a warrant, forced entry into defendant's residence. For the reasons set forth below, we conclude that the entry into the residence was justified under the emergency aid exception to the warrant requirement of Article I, section 9, of the Oregon Constitution. Accordingly, we reverse and remand.

We take the following facts, which are supported by the record, from the trial court's findings. *State v. McDonald,* 168 Or App 452, 459, 7 P3d 617, *rev den,* 331 Or 193 (2000). Deputy Brewster received a dispatch to respond to a domestic disturbance reported in a 9-1-1 call from an anonymous complainant. Brewster arrived at the residence five minutes after receiving the dispatch. Shortly after he arrived, two other deputies joined him as back-up; one of them, Marcellais, testified that the dispatcher had orally informed them that "the sounds the complainant heard were as if someone was being 'slammed around.'"

Nothing about the residence appeared unusual; there were, for example, no broken windows or damaged entryways. For seven or eight minutes, Brewster pounded on the door, identified himself as a law enforcement officer, and demanded that someone come to the door. There was no response and no sound indicating that anyone was at home, although two vehicles were parked at the residence.

Believing that the anonymous complainant might live next door, Brewster went next door but was unable to contact anyone there. He was able, however, to contact the complainant by telephone. The complainant specifically identified the vehicles at the residence, told Brewster that the vehicles belonged to the man and woman who lived at the residence, and reported "that the sounds heard were not someone pounding on the wall, but were definitely sounds of one person hitting another." Neither Brewster nor the other deputies knew, at that time, where the complainant lived or was located.

Meanwhile, Marcellais continued to pound on the door and shout. At one point, he heard through a second-story window the sounds of people walking around inside, with no sound of a physical fight; he conveyed that information to Brewster when Brewster returned to the residence. Brewster continued pounding on the door, identifying himself and demanding entry. The deputies spent a total of about 20 minutes knocking and demanding entry before finally forcing their way into the residence. During the time that the deputies were making their presence known, no one inside the residence requested assistance.

Brewster had 19 years of law enforcement experience, had received training in handling domestic violence cases, and had investigated domestic violence cases, including cases that involved serious physical injury and homicide. Regarding the situation as it appeared to the deputies, the trial court found:

> "From all the information, Brewster knew that he was called to the residence for a possible incident of domestic violence, and believed that one person had been hitting another person, and that the residents of the duplex had not left and were still in the duplex. He believed that someone in the residence may have been injured, possibly seriously, and or that because of being injured or being held hostage, may have been prevented by another from answering the door.

> "Brewster testified that he eventually decided to force entry into the house (without a warrant) for the purpose to check on the welfare of the occupants and to cause to cease any violent behavior which may be occurring in the residence."

The deputies kicked in the door, entered the residence, and discovered certain evidence of crimes, which defendant moved to suppress.

The trial court granted defendant's motion. In its conclusions of law, the court set out the legal framework of the emergency aid doctrine and then turned to the question "whether objective indicia of a true emergency existed at the time the officers entered the duplex." The court reasoned as follows:

"Officer Brewster received a dispatch to respond to a domestic disturbance. The CAD [computer-aided dispatch] stated that it was unknown i[f] the disturbance was physical in nature, although the complainant states that the sounds were as if someone was being 'slammed around.' Throughout their time at the residence, none of the deputies observed anything unusual about the residence (*e.g.*, no signs of a forced entry). The complainant was able to identify the vehicles in the driveway and in the yard as the vehicles that belonged to the male and female who lived in the residence. While Officer Marcellais testified that he heard people inside the residence, he did not testify that he heard any sounds of physical struggle or an indication that an act of violence had occurred inside the duplex. Moreover, no occupant of the duplex requested assistance from the police, even though the deputies had repeatedly made their presence known.

"Under these facts, the court finds that the [state] fails to carry its burden of showing that 'exceptional emergency circumstances' existed at the time the officers entered the duplex. First, there is no evidence that any officer believed that entry was necessary to protect life. While Officer Brewster testified that he decided to enter the duplex for the purposes to check on the welfare of the occupants, and that he was worried someone in the residence might have been injured, the record does not show compelling evidence to support Officer Brewster's conclusion."

The trial court went on to conclude that, under *State v. Salisbury*, 223 Or App 516, 196 P3d 1017 (2008), and *State v. Martin*, 222 Or App 138, 193 P3d 993 (2008), *rev den*, 345 Or 690 (2009), defendant's motion to suppress should be granted.

"In this case, the evidence presented by the [state] was the CAD report, which stated that it was 'unknown if [disturbance] physical,' and testimony from Officer Marcellais that the verbal information from the dispatcher * * * informed officers that complainant said that it sounds like someone was being 'slammed around.' Officer Brewster did testify that when he personally talked to complainant, the sounds were not someone pounding on the wall, but sounds of one person hitting another.

"The testimony of the complainant in this case is similar to the testimony of the neighbors in *Salisbury*: testimony of

what outside witnesses heard coming from inside the apartment—an inference of a physical struggle. However, as the court stated in *Salisbury*, * * * while it could be inferred that 'there were no longer any sounds coming from the apartment, the screaming woman inside the apartment was unable to respond to [the police's] inquiries due to injury or restraint, . . . that inference is counterbalanced by the inference that what the police heard was evidence of a domestic quarrel that did not require their intervention.' [223 Or App at 524.]

"As in [*Martin*] and *Salisbury*, there is no objective evidence that would indicate that the officers' entry into the duplex was required to protect a person from harm or risk of harm, other than Deputy Brewster's testimony that he believed that someone in the residence may have been injured and he wanted to check on their welfare. This testimony alone does not demonstrate the exceptional emergency circumstances required by the emergency aid doctrine. It necessarily follows that the entry into the duplex was unlawful and defendant's motion to suppress is granted."

(Second and third bracketed materials in original.)

The state appeals, arguing that the deputies' entry into the residence was justified under the emergency aid exception to the Article I, section 9, warrant requirement. That exception applies if the following conditions are met:

"(1) The police must have reasonable grounds to believe that there is an emergency and an immediate need for their assistance for the protection of life.

"(2) The emergency must be a true emergency—the officer's good faith belief alone is insufficient.

"(3) The search must not be primarily motivated by an intent to arrest or to seize evidence.

"(4) The officer must reasonably suspect that the area or place to be searched is associated with the emergency and that, by making a warrantless entry, the officer will discover something that will alleviate the emergency."

*State v. Follett*, 115 Or App 672, 680, 840 P2d 1298, *rev den*, 317 Or 163 (1992) (footnote omitted). The state has the burden to show that the circumstances at the time of the warrantless entry supported the emergency aid exception to the warrant requirement. *Salisbury*, 223 Or App at 524. To justify entering a residence because of an emergency, "the state must make a strong showing that exceptional emergency circumstances truly existed." *State v. Miller*, 300 Or 203, 229, 709 P2d 225 (1985), *cert den*, 475 US 1141 (1986) (citing *Vale v. Louisiana*, 399 US 30, 34, 90 S Ct 1969, 26 L Ed 2d 409 (1970)).

■ Here, the only dispute concerns the first two prongs of the emergency aid test, which effectively require that "the police officer must subjectively believe that his or her assistance is necessary to protect someone's life and that belief, evaluated at the time of the entry and not in light of subsequently discovered facts, must be reasonable." *Martin*, 222 Or App at 148 (citing *State v. Martofel*, 151 Or App 249, 252, 948 P2d 1253 (1997)).[1] The state contends that those requirements were satisfied because Brewster subjectively believed that immediate entry into the residence was necessary to protect life and his belief was objectively reasonable in light of the report of sounds of physical violence in the residence. Defendant responds that the trial court did not find that Brewster had the requisite subjective belief and that we must presume that the trial court found, consistently with its ultimate conclusions, that Brewster did not subjectively believe that forced entry was necessary to protect someone's life. In addition, defendant contends that any such belief was not objectively reasonable, because the circumstances did not constitute a true emergency and because information from an anonymous call is insufficient. We conclude that the state

---

[1] In *Martin*, 222 Or App at 149, the pertinent facts were these:

"At the time of their entrance, the officers knew only that defendant might have been the driver of a car involved in one minor hit-and-run accident with a parked car, after which she drove home; that she bumped into her garage, touching it 'lightly'; that she delayed responding to the officers' requests to answer her door; that, when she did answer, she was unclothed; and that, when she saw them, she ran to her bedroom. On those facts, any belief that defendant's life was endangered so as to necessitate immediate intervention would not be reasonable."

established the basis for application of the emergency aid doctrine.

We begin by addressing the officer's subjective belief. As set forth above, the trial court expressly found that Brewster "believed that someone in the residence may have been injured, possibly seriously, and * * * because of being injured or being held hostage, may have been prevented by another from answering the door." That finding is supported by evidence in the record. In light of that finding, we understand the trial court to have reached a legal conclusion about the *objective* basis for Brewster's belief, not a factual finding about Brewster's *subjective* belief, when the court later concluded—in the context of deciding that the state had failed to prove the existence of " 'exceptional emergency circumstances' "—that "there is no evidence that any officer believed that entry was necessary to protect life. * * * [T]he record does not show compelling evidence to support Officer Brewster's conclusion." In keeping with the trial court's finding that Brewster believed that a person in the residence might have been seriously injured and prevented from responding to police because of an injury or because of being held hostage, we conclude that the subjective belief portion of the test was proved.

■       We turn to whether that belief was objectively reasonable. As we explained in *Martofel*, we consider the circumstances known to the officers at the time the warrantless entry was made, without reference to after-acquired knowledge; "[a]lthough after-acquired knowledge might alter how the circumstances are viewed, that does not mean that the circumstances as earlier understood did not present a 'true emergency.' " 151 Or App at 252 (where officers received a report of a man with a gun in a residential Portland neighborhood, the emergency aid doctrine justified entry into the defendant's backyard to locate the armed man, although police later learned that the man was simply a hunter waiting for a ride and had left the neighborhood before officers arrived). Circumstances support an objectively reasonable belief that immediate action is required to preserve life

"if there are reliable, objective indicia of a potential victim of a dangerous circumstance or a potential perpetrator of a

dangerous act. Suspicious circumstances or 'gut instinct' are insufficient. The existence of an identifiable victim or perpetrator is significant because whether an emergency exists depends on whether immediate action is required ('something that will alleviate the emergency'), which, in turn, depends on the relationship between the gravity of the harm to be prevented and the probability that the harm will occur if action is not taken. *See Webster's Third New Int'l Dictionary* 741 (unabridged ed 2002) (defining 'emergency' as 'an unforeseen combination of circumstances or the resulting state that calls for immediate action'). In the absence of either a potential victim or a perpetrator (or other objective indicia of an immediate need for action to protect life), both the risk and gravity of harm to human life are purely speculative."

*State v. Burdick*, 209 Or App 575, 581-82, 149 P3d 190 (2006).[2] We independently determine whether the circumstances presented objective reasonable grounds to believe that an emergency existed. *McDonald*, 168 Or App at 459 (citing *State v. Toevs*, 327 Or 525, 535-36, 964 P2d 1007 (1998)).

The existence of an objectively reasonable basis is fact-specific, and we appreciate the trial court's conscientious application of our case law. Nonetheless, we conclude that, because the circumstances here included indications of physical violence inflicted on a person (as opposed to indications of a loud verbal dispute without signs of violence), the circumstances objectively indicated that a true emergency existed. That point is illustrated by several of our cases involving police responses to apparent domestic disputes.

In *State v. Agnes*, 118 Or App 675, 848 P2d 1237 (1993), we concluded that a true emergency existed. Police officers had received a report of fighting occurring in the defendant's apartment, with sounds of "banging, yelling and screaming." The officers knocked at the door; after a period during which a male voice told the officers to go away and yelled obscenities at them and a female voice said, "Just leave

---

[2] In *Burdick*, we concluded that such objective indicia existed where police had received reports that a man with a knife had entered the apartment of a woman who "was always there," and police received no response from the woman despite repeatedly pounding on her door. 209 Or App at 582.

me alone," a woman opened the door a few inches. Although she said that she was fine, the officers observed that she appeared frightened and disheveled; the furniture was in disarray, with a television halfway falling off a counter; and the defendant appeared belligerent and intoxicated. The officers pushed the door open and entered. *Id.* at 677. We concluded that a true emergency existed because it appeared that "[a] violent altercation had occurred, and the potential for further violence had not dissipated." *Id.* at 679.

In *Salisbury*, on the other hand, such indications of a violent altercation were absent. There, a police officer, after observing the defendant appear to commit a traffic violation, approached the defendant, but the defendant walked away from the officer, entered his apartment, and locked the door behind him. 223 Or App at 518-19. The officer subsequently heard "a female voice screaming, heard someone use a profanity, heard yelling and screaming with both a male and a female voice." *Id.* at 519 (internal quotation marks omitted). Concerned that someone might be in danger, the officer, with assistance from back-up officers, pounded on the door and finally forced the door open after 15 to 20 minutes. *Id.* at 519-20. There was no evidence that the officers heard any sound of a physical struggle or indication of a violent act. *Id.* at 524. Although the defendant's neighbors testified that they heard "at least one loud noise, a thud, that was not specifically identified, * * * that went on for some period of up to five minutes," there was no evidence that that information was communicated to the officers before their warrantless entry into the apartment. *Id.* at 519 (internal quotation marks omitted; ellipses in original). Under those circumstances, we concluded that the state had failed to prove that there was an objectively reasonable basis to conclude that entry into the defendant's apartment was immediately required to protect a person from harm. *Id.* at 524-25.

Similarly, a warrantless entry is not justified under the emergency aid doctrine when police are aware of only a loud argument, without any indication of a physical struggle or an act of violence. *State v. Fredricks*, 238 Or App 349, 358-59, 243 P3d 97 (2010). For example, in *State v. Baker*, 237 Or App 342, 240 P3d 735 (2010),[3] we distinguished

---

[3] Our decisions in *Fredricks* and *Baker* had not yet issued at the time that the trial court decided the motion to suppress at issue in this case.

between circumstances indicative of a physical altercation and circumstances indicative of only a verbal altercation. There, a 9-1-1 caller had reported hearing yelling and screaming from the home of a neighbor, Turnage, including Turnage's use of a prearranged code word indicating to the neighbor that she was in trouble and needed immediate police assistance; the caller also stated that a young child might be present. When police officers arrived at Turnage's house, they heard yelling, although they could not discern what was being said, and there was no evidence that they heard any indication of a physical struggle. The officers also encountered, on the front porch, a woman and a man who stated that they had been inside the house but gave no information about weapons, injuries, threats, or a need for police intervention to prevent harm. The officers started walking toward the back door of the house. Through a window, they saw the defendant and Turnage arguing but saw no indication of a physical conflict. *Id.* at 348. We concluded that, although the case was a close one, there were no objective indicia of a life-threatening emergency once the officers saw "that the couple was engaged in only a verbal, nonviolent argument unaccompanied by other evidence indicative of life-threatening violence[.]" *Id.* at 349. We distinguished *Agnes* on the basis that *Agnes* had involved a report of "banging" noises that were consistent with a physical struggle and the officers' observation of signs of violence. *Baker*, 237 Or App at 350.

Here, the circumstances, like those in *Agnes*, indicated more than a mere loud verbal dispute. The circumstances here included sounds of a person being "slammed around," that is, "sounds of one person hitting another." Although the deputies themselves did not hear the sounds of a physical struggle, they had been informed that those sounds had come from the residence, and Marcellais heard sounds of people inside the residence, indicating that the people involved in the struggle were still present. Based on the circumstances apparent from the facts found by the trial court, the state proved that there was an objectively reasonable basis to believe that immediate entry into the residence was necessary to protect life.

We reject defendant's argument that, because of the complainant's anonymity, the deputies could not rely on the information supplied by the complainant who called 9-1-1. Nothing in our case law suggests that a caller's anonymity, standing alone, would so undermine the credibility of a 9-1-1 report as to render reliance on the report objectively unreasonable. To the contrary, we have concluded that a true emergency existed in cases that began with anonymous reports. *See State v. Torres*, 201 Or App 275, 277-78, 118 P3d 268 (2005), *rev den*, 340 Or 308 (2006) (an anonymous caller reported that a man had broken the front window of a neighbor's house and climbed inside); *State v. Frink*, 42 Or App 171, 173, 600 P2d 456 (1979) (an anonymous report that someone named "Tim" was "shooting up" a child named "Junior" with drugs at a specified address).

Because the deputies' entry into defendant's residence was justified under the emergency aid doctrine, the trial court erred by granting defendant's motion to suppress.

Reversed and remanded.